STATE OF CONNECTICUT *v.* ASHEEK YUSUF
(AC 20529)

Foti, Dranginis and Healey, Js.

Argued December 4, 2001—officially released July 2, 2002

*Alice Osedach-Powers*, assistant public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Frank S. Maco*, state's attorney, *Dawn Gallo*, assistant state's attorney, and, on the brief, *Guy W. Wolf III*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Asheek Yusuf, appeals from the judgment of conviction, rendered after a jury trial, of kidnapping in the second degree in violation of General Statutes § 53a-94 (a), assault in the second degree in violation of General Statutes § 53a-60 (a) (2), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), threatening in violation

of General Statutes § 53a-62 (a) (1) and (2), and cruelty to persons in violation of General Statutes § 53-20. On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress evidence obtained from a warrantless search, (2) abused its discretion by admitting evidence of prior uncharged misconduct, (3) admitted expert testimony concerning battered woman syndrome and (4) permitted the prosecutor to engage in misconduct during closing argument, which denied the defendant a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In July, 1998, the defendant and the victim, Carissa LeJeune, lived together in an apartment at 58 Yorkshire Street in Torrington. The defendant and LeJeune had been romantically involved with each other for about one year and, during that relationship, the defendant greatly restricted LeJeune's movement. If LeJeune had to leave the apartment to go somewhere, the defendant demanded that she page him to tell him of her whereabouts. He allowed her to go across the street to the Patco store to buy snacks, cleaning supplies and the like, and to use a pay telephone. He did not, however, allow her to speak to any men and only to certain friends. Although LeJeune worked, the defendant would pick her up from work and bring her home.

On July 29, 1998, at approximately 11 p.m., LeJeune went across the street to call her friend, Serita Oligny, from the pay telephone. The defendant had forbidden LeJeune from contacting Oligny. While she was speaking with Oligny, the defendant approached in his car. When LeJeune saw the defendant approaching, she immediately hung up the phone. The defendant asked LeJeune who she had been speaking with, and she told him Cristin Fitzgerald, a friend to whom the defendant allowed her to speak. He did not believe her and ordered her to get into the car. Upon returning to their apart-

ment, the defendant dragged her up the stairs to the kitchen where he threw her to the floor and kicked her in the back and crotch as he yelled that she had lied to him. He then drove LeJeune back to the pay telephone across the street and called Fitzgerald himself to determine whether she was the person to whom LeJeune had been speaking when he approached in his car. Fitzgerald said that she had spoken to LeJeune earlier that day. The defendant confronted LeJeune about her lie and called Oligny to determine whether she was the person LeJeune had telephoned. Oligny initially denied that LeJeune had telephoned her, but after LeJeune screamed at her to tell the truth, she told the defendant that she had been speaking to LeJeune when he approached in the car.

After the defendant finished speaking to Oligny, he and LeJeune got back in the defendant's car and he punched her in face. When she began to bleed, he warned her not to bleed all over his car. They drove around until the defendant decided to stop at a nearby house. He went into the house and a short time later came out with a mini blind rod. Once he resumed driving, he hit LeJeune across her face with the rod and, when she put her head between her knees to avoid additional blows, he began hitting her on her head, back and legs. As he hit LeJeune, he asked her why she had betrayed him by speaking to Oligny and others and by going out. The defendant then ordered LeJeune to hold out her hands, which he hit with the rod because she had used them to dial the telephone. In addition, he repeatedly hit her in the face and forcefully pushed her head into the seat belt buckle. LeJeune did not attempt to open the car door and escape because the defendant did not permit her to touch the door and had threatened to kill her if she did so.

When they returned to their apartment, the defendant brought LeJeune into the living room, and ordered her

to take off her clothes and kneel in front of a wall with her hands behind her back and her forehead to the wall. Again, he asked her why she had betrayed him and lied to him. He also asked her if she was sleeping with her uncle and, when LeJeune replied that she was not, forcefully pushed her head against the wall. LeJeune remained kneeling for several hours, during which time the defendant ate dinner and watched television. LeJeune asked the defendant if she could lie down because she felt lightheaded, but he did not allow her to lie down until he went to bed.

On July 30, 1998, at approximately 7 a.m., the defendant awakened LeJeune and asked her to iron his shirt because he had to appear in court. Because of her weakened condition, she had to prop herself up while lying on her stomach to iron his shirt. When she finished ironing his shirt, LeJeune went back to sleep. Before leaving for court, the defendant again ordered LeJeune to remain in the apartment. When he returned, the defendant, holding a razor blade in his hand, awakened LeJeune. He then cut the tip of her nose with the razor blade and told her that she was poison and that she should kill herself. Thereafter, he told her to take a shower because she had dried blood on her and she was "disgusting." Before she could do so, the defendant told her to leave the bathroom so that he could use it. When he came out of the bathroom, the defendant picked up a steak knife and started to cut LeJeune on her foot, leg and arm while telling her that she was not going to make a fool out of him. He then threw the knife into the sink and left the apartment, again warning LeJeune not to leave and stating that if she did leave, he would kill her. LeJeune was aware that the defendant kept an operable gun in the trunk of his car. She recently had seen the gun in the defendant's possession and was present when it was discharged.

Despite the defendant's threat, LeJeune got dressed and left the apartment. She walked to a friend's house nearby and used the telephone to call for a ride. She did not wait for her ride at her friend's house, fearing that if the defendant found her there her friend also would be at risk. Instead, she waited across the street in the doorway of a bowling alley. A short time later, a family friend picked her up and brought her to the hospital where she was treated for her injuries.[1] While she was at the hospital, the police were called. The police questioned LeJeune and took photographs of her injuries. Thereafter, LeJeune's mother arrived, and she and LeJeune drove to the Yorkshire Street apartment to retrieve LeJeune's belongings.

As LeJeune was standing outside the apartment, the Torrington police arrived at the scene. LeJeune spoke with the police, telling them, among other things, that she lived there. One of the officers proceeded to knock on the apartment door to check if the defendant was in the apartment. No one answered. Detective John Murphy then asked LeJeune if she was willing to sign a consent to search form. The form stated that she had a right to refuse to consent to a warrantless search of her apartment and that she was signing the form voluntarily. LeJeune signed the form, and the police searched the apartment. After they determined that the defendant was not present, the police seized a steak knife and a razor blade from the apartment. The police also took photographs of the apartment. The defendant subsequently was arrested and charged.

After a jury trial, the defendant was convicted of kidnapping in the second degree, assault in the second

---

[1] At trial, LeJeune, with the aid of photographs, testified concerning her injuries. She testified that she was unable to eat regular food for several weeks because of the injuries the defendant had inflicted on her jaw and that she still experienced pain in her legs. She also testified that the defendant had burned her thigh with a cigarette lighter one or two days before July 30, 1998.

degree, unlawful restraint in the first degree, threatening and cruelty to persons. The court sentenced the defendant to a total effective term of twenty-nine years imprisonment, execution suspended after fifteen years, and five years probation with special conditions. This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant first claims that the court improperly denied his motion to suppress evidence obtained by the police from a warrantless search in violation of his rights under the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut.[2] Specifically, the defendant argues that the state failed to prove that LeJeune had the authority to consent to the search of the apartment and that the police reasonably believed that she had the authority to consent to the search. He also argues that the court's reasoning with respect to its denial of his motion to suppress was "flawed." We disagree.

The following additional facts are necessary for our resolution of the defendant's claim. Prior to trial, the state proposed to offer as full exhibits the steak knife and the razor blade that the police had seized from the apartment. The defendant filed a motion to suppress that evidence, claiming that "the search was conducted absent a search warrant and no exception to [the] search warrant requirement applie[d]." The court conducted an evidentiary hearing on the defendant's motion to suppress. At the hearing, the defendant testified that he lived alone at the 58 Yorkshire Street apart-

---

[2] The defendant does not set forth a separate claim, accompanied by an independent analysis, under the Connecticut constitution. In his appellate brief, the defendant states: "The defendant is not making a claim that the Connecticut constitution offers him greater protection than the federal constitution for third party consent to search issues, therefore a separate state constitutional analysis is omitted."

ment and that he lived there pursuant to a lease that he signed as "Lorenzo Montgomery."[3] He also testified that he had obtained the money for the security deposit from his family. The defendant further testified that LeJeune did not live with him, that she was never present in the apartment and that she did not have her clothes, toiletries or any of her personal property there.

On the other hand, LeJeune testified that she moved in with the defendant at the 58 Yorkshire Street apartment on July 17, 1998, and that she still was living there on July 30, 1998, the date of the search.[4] She further testified that she provided the money for the security deposit that enabled her and the defendant to rent the apartment. LeJeune also testified that when she moved in, she brought one week's supply of clothing and other personal items, and that her friend was to bring the rest of her belongings at a later date. She also described the apartment as having four rooms—a bathroom, living room, kitchen and bedroom, which she shared with the defendant.

In its memorandum of decision denying the defendant's motion to suppress, the court stated: "The evidence . . . established that both Carissa LeJeune and the defendant lived at the apartment in question. The court finds Ms. LeJeune's testimony that she moved into the premises on July 17, 1998, and still lived there on the date of the search to be credible and persuasive." The court reasoned that "[a]lthough [the] defendant asserts that there were no other indicia of Ms. LeJeune living in the apartment . . . the court finds Ms. LeJeune's own testimony that she lived there, provided the

[3] The defendant testified that he gave the name Lorenzo Montgomery to the landlord when renting the apartment because "[t]hat's the person [whose] credit was used to approve the apartment."

[4] LeJeune testified that she remembered that she had moved in with the defendant on July 17, 1998, because that was his birthday. The record indicates that the defendant was born on July 17, 1973.

funds for the security deposit, and intended to bring all her clothing to the apartment to be believable and convincing. The couple had just moved into the apartment a couple of weeks earlier. It is not unusual that such incidents of occupancy as a telephone, name on the door or mailbox, receiving mail at a new home and change of address not occur immediately after moving into a new home, but instead take some time."[5] In addition, the court noted that "[t]he defendant's testimony that he alone lived in the apartment lacked credibility, not just because Ms. LeJeune's actual testimony was more believable than his or his interest in the outcome, but also because of his demeanor and testimony on the witness stand during the [hearing]." Specifically, the court cited to the defendant's testimony about signing the lease as Lorenzo Montgomery and about being present in the apartment all day on July 30, 1998, as "cast[-ing] doubt on the overall veracity of his testimony."[6]

The court concluded that "[a]s an occupant of the premises, LeJeune was lawfully entitled to give the police permission to search her home and seize items from it to be used in a prosecution of the defendant" and that because of his "coresiding" with LeJeune in the apartment, the defendant "had no reasonable expectation of privacy as to items in the apartment." The court further concluded that the evidence established that "LeJeune voluntarily consented to the search" when she signed the consent to search form and that there was no indication that "her will was overborne or that her consent was the result of promises, force, threats or other coercion." Finally, the court determined that "there is no evidence that the defendant had exclu-

---

[5] The court noted that LeJeune had testified that the defendant's name also was not on the mailbox or door.

[6] On cross-examination, the defendant testified that he was in the apartment all day on July 30, 1998, but on redirect examination, he qualified his earlier statement by explaining that he had meant to testify that he was there until he left the apartment on that day.

sive control over any part of the apartment; nor is there evidence . . . that the police had reason, at the time consent was given, to doubt the accuracy of the claims of the person giving consent [i.e., LeJeune]."

As a preliminary matter, we set forth the standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001). On a motion to suppress, "[i]t is the function of the trier to determine the credibility of witnesses and the weight to be given their testimony." *State* v. *Zindros*, 189 Conn. 228, 240, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984).

"It is axiomatic that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Guertin*, 190 Conn. 440, 446, 461 A.2d 963 (1983)." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 49 Conn. App. 699, 700, 716 A.2d 137, cert. denied, 247 Conn. 943, 723 A.2d 323 (1998). "A warrantless search or entry into a house is not unreasonable, however, under the fourth amendment to the United States constitution or article first, § 7, of the Connecticut constitution when a person with authority to do so has freely consented. *State* v. *Reagan*, 209 Conn. 1, 7, 546 A.2d 839 (1988). It is the state's burden to prove that the consent was freely and voluntarily given, and that the person who purported to consent had the authority to do so. *Bumper* v. *North Carolina*,

391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968); *State* v. *Reagan*, supra [603]. Such consent may not be established by mere acquiescence to police authority." *State* v. *MacNeil*, 28 Conn. App. 508, 513, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992). "Whether there was valid consent to search is a factual question that will not be lightly overturned on appeal. *United States* v. *Sanchez-Jaramillo*, 637 F.2d 1094, 1098 (7th Cir.), cert. denied, 449 U.S. 862, 101 S. Ct. 166, 66 L. Ed. 2d 79 (1980)." (Internal quotation marks omitted.) *State* v. *Rodriguez*, supra, 700.

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States* v. *Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). "Common authority is . . . not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (Citations omitted.) Id., 171 n.7.

In addition, a warrantless search is valid when it is based on the consent of a third party who the police, at the time of the search, reasonably believe possesses common authority over the premises but who in fact does not have such authority. *Illinois* v. *Rodriguez*, 497 U.S. 177, 188, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990).

"As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" (Internal quotation marks omitted.) Id.

In the present case, the court, in its thoughtful and thorough memorandum of decision, determined that the evidence established that LeJeune and the defendant lived together at the apartment and that, as an occupant, LeJeune lawfully was entitled to give the police permission to search her home and seize items therefrom. The court further concluded that LeJeune voluntarily had consented to the search and that there was no indication that her will was overborne or that her consent was the result of promises, force, threats or other coercion. It is apparent that witness credibility was crucial in the court's ruling. Although the parties presented two different scenarios with respect to their living arrangement, the court stated that it did not find the defendant's testimony credible and that it found LeJeune's testimony "credible and persuasive." "It is the function of the trier to determine the credibility of witnesses and the weight to be given their testimony." State v. Zindros, supra, 189 Conn. 240.

On the basis of our review of the whole record, we conclude that the court's findings were not clearly erroneous, and that its denial of the defendant's motion to suppress legally and logically was correct and properly supported by the facts. We further conclude that the court's reasoning with respect to its denial of the motion to suppress was not "flawed," as the defendant claims. Accordingly, the court properly denied the defendant's motion to suppress.[7]

---

[7] Because we conclude that the court properly determined that LeJeune freely and voluntarily gave her consent to search the apartment and that she had the authority to do so, we need not consider whether the police

## II

The defendant next claims that the court abused its discretion by admitting evidence of his prior uncharged misconduct. Specifically, the defendant argues that the purpose for which the evidence was admitted does not fall into any exception that permits the admission of otherwise inadmissible evidence. He further argues that the evidence of prior misconduct was not relevant to the charges against him, that it was more prejudicial than probative and that its admission deprived him of a fair trial. We disagree.

The following additional facts are necessary for our resolution of the defendant's claim. At trial, the state sought to elicit testimony from LeJeune regarding a number of prior incidents in which the defendant had inflicted physical harm on her. LeJeune testified that during the course of the year she dated the defendant, he had (1) burned her with a lighter, (2) kicked her on her leg, causing an imprint of his boot, (3) hit her continuously on her legs with a one liter Nestea bottle, (4) kicked her in the face, causing her nose to bleed and (5) punched her in the face, splitting her lip. The state sought to admit those acts of prior misconduct as a predicate to the testimony of Evan Stark, the state's expert on battered woman syndrome. The state

reasonably believed that she had the authority to consent to the search. Moreover, even if we did consider that claim, we would conclude that the court properly determined that the police, at the time of the search, reasonably believed that LeJeune had the authority to consent to the search.

In so concluding, we note that in his appellate brief, the defendant raises for the first time the issue of LeJeune's age as a factor to be considered in determining whether the police were reasonable in their belief that she had authority to consent to the search. We can presume fairly that the court considered LeJeune's age in arriving at its decision. Furthermore, the defendant did not seek review of his claim under either the plain error doctrine; Practice Book § 60-5; or *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, therefore, we would decline to review his claim even if we were to consider the "reasonable belief" issue.

explained that it intended "to offer a continuum of acts of battery against [LeJeune] over a period of time to show how she became a battered woman and why she didn't do some things that other people might have done, like leave when she had the opportunity." Defense counsel objected to the admission of the prior misconduct evidence.

The court allowed the introduction of the prior misconduct evidence "to show or establish why LeJeune acted in this case as she did. In other words, to explain her conduct." It ruled that the defendant's prior misconduct was admissible "subject to linking [it] up and subject to the predicate conduct necessary being shown for Dr. Stark to testify." The court further ruled that at least one of the acts was "admissible to show the assault in the second degree." The court also gave a thorough limiting instruction to the jury as to that evidence during LeJeune's testimony.[8]

---

[8] The court instructed the jury: "Okay, members of the jury, before we begin, I would just like to go over one thing with you. In this case, you heard some evidence of some prior actions on the part of the accused such as hitting or threatening Ms. LeJeune on prior occasions that occurred before the instances that are alleged in this case. Evidence of actions or deeds of the defendant that he is not on trial for here is not admitted to prove the bad character of the defendant. It's not admitted to prove that he has a tendency to commit criminal acts. It's not admitted to prove that he's a bad person. It's not admitted to prove that he committed the specific acts that are alleged here. Such evidence was admitted solely to show or establish by Ms. LeJeune why [she] acted in this case as she did. In other words, to explain her conduct. So, you must not consider evidence of deeds or actions that are not charged here that you might regard as misconduct as establishing a predisposition on the part of the defendant to commit maybe crimes that are charged or demonstrate the criminal propensities. You can consider such evidence if you believe it and you find it logically, rationally and conclusively supports the evidence. The issues for which it's being offered by the state, namely, to explain Ms. LeJeune's conduct, but only as you find it to bear on that particular point. And if you do not believe such evidence or if you find that it does not logically, rationally and conclusively support that issue, namely, to explain her conduct, then you may not consider that testimony for any other purpose."

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held that such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . .

"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . The problem is . . . one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 396–97, 788 A.2d 1221 (2002).

In the present case, the state presented evidence that the victim was a battered woman, suffering from what

has been classified as battered woman syndrome. The state's expert, Stark, testified as to the cyclical nature of the violence perpetrated on battered women by their batterers and the effects of such violence on those women. The evidence of the defendant's prior misconduct toward LeJeune corroborated Stark's testimony. We conclude therefore that evidence of the defendant's prior incidences of violence toward LeJeune was relevant and material to corroborating crucial prosecution testimony in that it demonstrated the manifestation of the battered woman syndrome as it affected LeJeune. See id., 398.

With respect to whether the court properly determined that the probative value of the prior misconduct evidence outweighed its prejudicial effect, we conclude that the court's determination was proper. Given LeJeune's testimony concerning the brutality of the incidents that took place on July 29 and 30, 1998, the prejudicial impact of the relatively less brutal prior misconduct evidence was minimal, and it is unlikely that it unduly aroused the jury's emotions, hostility or sympathy, especially in light of the court's limiting instruction.[9] See *State* v. *Battista*, 31 Conn. App. 497, 514–16,

---

[9] See footnote 8.

In addition, in its final charge to the jury, the court instructed: "Evidence of prior acts of the defendant. In this case, the state has offered evidence of prior acts of misconduct by the defendant, such as hitting or threatening Carissa LeJeune on an occasion that occurred before the offenses alleged in the information. This evidence of prior acts and deeds of misconduct by the defendant for which he is not on trial here was not admitted to prove the defendant is a bad person, has a bad character or has a tendency to commit criminal acts. Such evidence was admitted for the following purposes: To show the effect of the defendant's conduct on Ms. LeJeune as to why Ms. LeJeune acted in this case as she did, to explain her conduct, and to show the history of the relationship between the accused and Ms. LeJeune insofar as that relationship may bear on the motive of the accused to commit these crimes or his intent to do so.

"You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity.

"You may consider such evidence if you believe it and further find it

626 A.2d 769, cert. denied, 227 Conn. 907, 632 A.2d 696 (1993); see also *State* v. *Sauris*, 227 Conn. 389, 403, 631 A.2d 238 (1993) (absent clear indication to contrary, jury presumed to have followed court's instructions).

We perceive no impropriety in the court's admission of the prior misconduct evidence to demonstrate the manifestation of battered woman syndrome as it affected LeJeune. See *State* v. *Vega*, supra, 259 Conn. 398–99. The court properly determined that the probative value of the prior misconduct evidence outweighed its prejudicial effect. Accordingly, we conclude that the court did not abuse its discretion in admitting evidence of the defendant's prior uncharged misconduct.

## III

The defendant next claims that the court improperly allowed Stark, a sociologist, to testify as an expert witness on battered woman syndrome. Specifically, he claims that (1) Stark's testimony was "minimally" relevant because the state presented no evidence that LeJeune was a battered woman, (2) the prejudicial effect of Stark's testimony outweighed its probative value, and (3) Stark's testimony bolstered LeJeune's credibil-

logically, rationally and conclusively supports the issue for which it's being offered by the state, showing the history of the relationship between [the defendant] and Ms. LeJeune as that may bear on his motive and intent and explaining Ms. LeJeune's conduct, but only as it may bear here on these issues.

"On the other hand, if you do not believe such evidence or, even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it's being offered by the state, then you may not consider that testimony for any purpose.

"You may not consider the evidence of prior misconduct for any other purposes because it may predispose your mind uncritically to believe that the defendant may be guilty of the offense here charged merely because of the alleged prior misconduct. For this reason, you may consider this evidence only on the issues of showing the history of the relationship as that may bear upon motive or intent of the accused or for explaining Ms. LeJeune's conduct and for no other purposes."

ity and, thus, invaded the province of the jury. We are not persuaded by any of those claims.

The following additional facts are necessary for our resolution of the defendant's claim. After LeJeune testified at trial, the state called Stark to testify as an expert witness on battered woman syndrome. The defendant filed a motion in limine to preclude Stark's testimony, arguing that the state had not established a proper foundation for the testimony. The defendant, citing *State* v. *Ali*, 233 Conn. 403, 431, 660 A.2d 337 (1995), also argued that although similar testimony in other cases has been allowed to explain a victim's recantation relative to battered woman syndrome, Stark's testimony was not admissible because there was no evidence that LeJeune had recanted.

The court conducted a lengthy hearing on the defendant's motion. At the hearing, the state argued that Stark's expert testimony was necessary to assist the jury in understanding why LeJeune did not end her relationship with the defendant after the prior assaults, why she did not report the prior assaults to the police, why she did not leave the scene after the subject assaults despite the opportunity to do so and why she complied with the defendant's demands. The state further argued that Stark's input on battered woman syndrome would enable the jury to better determine whether LeJeune fit the profile of a battered woman. In response, the defendant argued that the jury did not need Stark's testimony to explain LeJeune's conduct. He further argued that the testimony was immaterial, irrelevant and more prejudicial than probative.

After reviewing the cases that counsel cited and considering their arguments of counsel, the court denied the defendant's motion in limine and allowed the state to present Stark's testimony. In so doing, the court determined that recantation was not "a necessary pre-

requisite" for the admission of expert testimony on battered woman syndrome, but rather it was "just one kind of . . . paradoxical behavior that someone might not understand . . . ."[10] The court stated that it is "particularly appropriate to use expert testimony to explain this kind of behavior of not reporting the crime or not attempting to leave when the opportunity presented itself because that conduct seems unusual and, without explanation, would raise questions about whether the conduct actually happened." The court also determined that the state could pose appropriate hypothetical questions to Stark as he testified.

## A

The defendant first claims that Stark's testimony was "minimally" relevant because the state presented no evidence that LeJeune was a battered woman. We disagree.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 353, 696 A.2d 944 (1997). "Expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . .

"[E]vidence is relevant only when it tends to establish the existence of a material fact or to corroborate other direct evidence in the case. . . . [T]he test of relevancy is not whether the answer sought will elucidate any of

---

[10] We, as did the trial court, do not read *State* v. *Ali*, supra, 233 Conn. 403, to stand for the proposition that recantation is a condition precedent to the admissibility of expert testimony in such cases.

the main issues, but whether it will to a useful extent aid the court or jury in appraising the credibility of the witness and in assessing the probative value of the direct testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Battista*, supra, 31 Conn. App. 513.

Our Supreme Court has held that expert testimony concerning battered woman syndrome is relevant "to describe the behavior patterns typically ascribed to battered [woman] syndrome." *State* v. *Borrelli*, 227 Conn. 153, 174, 629 A.2d 1105 (1993). "Of course, expert testimony, like all other evidence, must be relevant to be admitted. . . . Expert testimony on the subject of battered [woman] syndrome is not relevant unless there is some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior." (Citation omitted.) Id., 172 n.15.

In the present case, Stark testified at length with respect to battered woman syndrome on the basis of his experience with battered women and research into domestic violence.[11] Stark defined "woman battering" as "involv[ing] a course of conduct that includes, but is not limited to, multiple instances of physical abuse or assault and the pattern of isolation, intimidation, mental abuse and control." He indicated that there is a subgroup of battered women, which, as a result of repeated abuse, suffers what he termed a "learned help-

---

[11] Stark's qualifications to testify with respect to battered woman syndrome were developed at length and were unchallenged, and, therefore, we will not reiterate them. We note, however, that his experience and expertise on that subject are set forth in a number of appellate decisions in cases in which he presented expert testimony. See, e.g., *State* v. *Borrelli*, supra, 227 Conn. 166–67; *State* v. *Niemeyer*, 55 Conn. App. 447, 451, 740 A.2d 416 (1999), rev'd in part on other grounds, 258 Conn. 510, 782 A.2d 658 (2001).

lessness," which is exhibited "after they [experience] frustration in trying to extricate themselves from the situation or, for whatever reason, they simply [give] up for a period of time, at least, and [believe] that they [cannot] escape from the situation even when there [are] opportunities for them to do so."

Stark then described the second part of the syndrome, the "cycle of violence," which "feeds into" the learned helplessness. He explained that in abusive situations, "there [is] a buildup of tension, which [creates] tremendous anxiety and fear on the part of the victim, and then there [is] an episode of physical abuse . . . ." Thereafter, he continued, there occurs what is called "the honeymoon phase" in which the abusive partner apologizes. Stark indicated that it is during that honeymoon phase that a battered woman often is drawn into the relationship because she "desperately [wants] to believe things [will] change, [and she hopes] they might change during this period where the apology or the promises dominate, [and] the battered woman in a sense [gets] sucked into the relationship more deeply than she would have otherwise been; common sense should have told her to leave, but now she's confused . . . [a]nd the result is . . . that she is there when the second episode occurs and possibly the third." Stark testified that at that point, the abuser "may no longer apologize, he may no longer be promising change, but because of the cycle of violence, she's in some sense entrapped in the relationship and, because of the ongoing abuse, that entrapment leads to . . . learn[ed] helplessness and then, at least for a period of time, [she] is unable to seek help . . . even when it's offered." Such women, Stark explained, "shift their focus from escape, from getting out of the relationship, to merely surviving in the relationship, and they may identify exposing the facts in the relationship to friends or authorities as counter to their interest in surviving

either because [the abuser] threatened them with punishment if they report or because they believe at that point, because of the isolation and intimidation, that he has powers which he does not have, in her mind."

During his testimony, Stark also was asked a number of hypothetical questions that tracked the facts that gave rise to the charges against the defendant.[12] Gener-

---

[12] The state's questions and Stark's responses in relevant part were:

"[Prosecutor]: Assume the following facts: A fifteen year old woman becomes romantically involved with a twenty-four year old man who is physically larger and stronger than her. The relationship continues for about a year. During that relationship, the woman is assaulted, punched with fists, kicked with feet, assaulted with inanimate objects, burned with a lighter, verbally degraded with obscenities, all by that same man who's in the relationship with her. She's seriously assaulted perhaps five or six times over the course of this relationship. She never calls the police. She never reports this. She remains in the relationship. Is this behavior on the part of the woman consistent with behavior of a woman suffering from battered woman syndrome?

"[Witness]: Certainly.

\* \* \*

"[Prosecutor]: Is it consistent with battered women that a woman in that situation, in a relationship wherein she suffered assaults five or six times over the course of that relationship, is it consistent that she may not report these assaults to the police?

"[Witness]: Yes.

"[Prosecutor]: And is there—what role, if any, do minor assaults play based upon your study of women in such situations?

"[Witness]: In our experience . . . the vast majority of assaults and battering situations tend to be minor rather than significant in the criminal justice and medical sense. And the effect of those assaults, in addition to the severe assaults which punctuate the history of ongoing minor assaults, is a level of physical intimidation that can create the learned helplessness that we described earlier. There are a variety of reasons why women don't report, but the data is pretty clear that in only a very small minority of instances where history of battering is established are women able or do they call the police or visit the hospital.

"[Prosecutor]: Doctor, assume further that this particular man instructs a woman that she must call or page him before she goes anywhere, tell him who she'll be seeing, where she'll be going, when she'll return, she has to get [his] permission before she goes out before leaving work, she complies with this order. Is this consistent with a woman suffering battered woman syndrome?

"[Witness]: Yes.

ally, with respect to each hypothetical question, Stark

"[Prosecutor]: And why is that?

"[Witness]: In situations—first of all, let me say that the beeper is being used . . . more and more frequently in my experience in this area as a way of reporting in and as a form of control. So, that particular thing is certainly consistent in the hypothetical that you offered with what we know about battering, in this area at least. . . . [I]n addition, because of the isolation and because of the intimidation, the victim often concludes that what is right for her is following the rules. You can get almost a hostage-like situation which creates almost like childlike dependence on the batterer. It's maybe hard for people to understand this . . . .

"The question of why women don't leave in situations like that, or why they don't report, is probably the most perplexing to people who work in the area. And what we've learned . . . is that they don't leave because it's more dangerous to leave often than to stay. They don't leave because they love the guy and they hope that things will change even though they fear it won't, and a variety of other reasons associated with that, economic reasons and other dependence. But the main reason they don't leave, seems to be because of the level of control that is not easily observed by people who are outsiders, that he exercises over her every movement and everyday life, in her mind, if not in fact, but usually a combination of both.

"[Prosecutor]: Specifically relating to—continuing from that answer, assume these facts: A man becomes enraged over something because the woman has disobeyed or lied to him. He orders her into his car . . . [h]e beats her, assaults her. He then leaves the car momentarily later on, he threatens to kill the woman if she leaves the vehicle, the woman remains in the car. Is it consistent with battered woman syndrome for a woman to comply in this type of situation with a man's orders even though she may have an opportunity to escape?

"[Witness]: Yeah. I mean, unfortunately it is. What we may think is an opportunity to escape, in her mind may not be. Or she may think, and this is very commonly the case, that if she escapes and she's found, and she believes . . . that he can find her anywhere . . . that she's even going to be hurt worse; again, as strange as it may sound, there are many women who believe [that] getting the beating over with is better than living with the fear and anxiety and stress of what will happen to them if he does find them and she does escape. . . . [E]ven people who are mature in years can be reduced to almost childlike dependence in this situation and be paralyzed by the fear of what will happen to them even when to an outsider it seems perfectly reasonable they should open the door, and in the hypothetical you offer, of a car and simply run away.

"[Prosecutor]: Assume further that the man returns to the car and drives the woman to their apartment, drags her into the apartment, he orders her to remove clothing, orders her to a specific area of the apartment, assaults her . . . mandates that she remain there, eats his dinner, goes to sleep, allows her to go to sleep . . . the woman sleeps next to him, the man

was asked to give his expert opinion whether the hypothetical victim's conduct was consistent with that of a woman suffering from battered woman syndrome. In each case, Stark concluded that the victim's conduct as set out in the hypothetical question was indeed consistent with a woman suffering from battered woman syndrome.

As previously stated, before expert testimony about battered woman syndrome becomes relevant, an evidentiary foundation must first be established that the victim is a battered woman and that her conduct is such that the jury would be aided by expert testimony providing an explanation therefor. See id. Here, contrary to the defendant's assertions, we conclude that the state presented sufficient evidence of an abusive relationship warranting the testimony on battered woman syndrome.

The state presented evidence that the defendant battered LeJeune on a number of occasions during the course of their relationship. Stark's testimony was offered to assist the jury in understanding whether LeJeune's conduct was consistent with the pattern and profile of a battered woman. His expert testimony provided the jury with a relevant insight into LeJeune's behavior that it might not otherwise bring to its evalua-

---

wakes, tells the woman if she leaves the apartment he will kill her, he leaves, the woman falls asleep. Is that a similar situation, similarly consistent with what you just described?

"[Witness]: Yes, it is.

"[Prosecutor]: Despite having a possible method or means or opportunity to escape, does not?

"[Witness]: Well, what you're describing in the hypothetical is what I would call a hostage-like situation, almost. Where, at least, in her mind, these opportunities to escape are not available even though they may be, again, to an outsider. . . .

"[Prosecutor]: The scenario I painted in the last hypothetical . . . is it consistent type of behaviors with a woman who is suffering battered woman syndrome?

"[Witness]: It is."

tion of her credibility. That insight was made more significant in light of the defendant's extensive cross-examination of LeJeune, which focused on her failure to escape from the defendant when she had the opportunity to do so.

Moreover, Stark's testimony was particularly crucial to the jury's determination because although battered woman syndrome has become known to the public more widely than it was in the past, much of the subject still remains beyond the ken of the average juror. Indeed, "[c]ommentators have noted that the research data indicates that potential jurors may hold beliefs and attitudes about abused women at variance with the views of experts who have studied or had experience with abused women. In particular, males are likely to be skeptical about the fear the woman feels in an abusive relationship and about her inability to leave a setting in which abuse is threatened." (Internal quotation marks omitted.) Id., 167. Reliance, therefore, on an expert such as Stark in a case such as this one was well warranted. See *State* v. *Vega*, supra, 259 Conn. 393.

We conclude therefore that the court properly determined that Stark's testimony concerning battered woman syndrome was relevant to assist the jury in understanding whether LeJeune's conduct was consistent with the pattern and profile of a battered woman and to the issue of her credibility.

B

The defendant also claims that the prejudicial effect of Stark's testimony outweighed its probative value. We disagree.

"There are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2)

where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Battista*, supra, 31 Conn. App. 515–16. "The primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. . . . We note that [b]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Servello*, 59 Conn. App. 362, 377, 757 A.2d 36, cert. denied, 254 Conn. 940, 761 A.2d 764 (2000).

As we already have concluded, Stark's testimony could have assisted the jury substantially in understanding whether LeJeune's conduct was consistent with the pattern and profile of a battered woman. The court reasonably could have concluded that the probative value of that evidence outweighed its prejudicial effect. We therefore are not persuaded that the court abused its discretion in admitting Stark's testimony, especially in light of the court's limiting instruction to the jury.[13]

---

[13] In its final charge to the jury, the court instructed in relevant part: "Dr. Stark's testimony presented a general description of battered woman syndrome, and he then testified as to certain characteristics that are commonly found in relationships involving domestic violence and on general or typical behavior patterns of victims of domestic violence. Dr. Stark, however, did not testify about whether Carissa LeJeune was in fact battered or whether her testimony here in court was truthful and accurate. His testimony was offered instead to help you understand whether Ms. LeJeune's conduct was consistent with the pattern and profile of a battered woman to help explain her conduct and thus to aid you in evaluating the credibility of her testimony.

"Expert testimony is presented to you to assist you in your deliberations. No such testimony is binding upon you, however, and you may disregard

C

The defendant's last claim relative to Stark's testimony is that it improperly bolstered LeJeune's credibility and, thus, invaded the province of the jury. We are not persuaded.

There is a "critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility." *State* v. *Spigarolo*, 210 Conn. 359, 379, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). Expert testimony properly may be admitted to assist the jury in understanding not whether the victim was credible on the witness stand, but whether the victim's conduct was consistent with the pattern and profile of a battered woman. See *State* v. *Borrelli*, supra, 227 Conn. 174. Such explanatory testimony does not invade the province of the jury in assessing the credibility of witnesses. Id. Furthermore, it is not impermissible for an expert witness to respond to hypothetical questions about the behavior of abuse victims for the purpose of establishing that the victim's behavior was generally consistent with that of such victims. See *State* v. *Freeney*, 228 Conn. 582, 592–93, 637 A.2d 1088 (1994).

In the present case, Stark did not give his opinion as to whether LeJeune testified truthfully or whether she in fact suffered from battered woman syndrome. His expert testimony could have assisted the jury substantially in understanding whether LeJeune's conduct was consistent with the pattern and profile of a battered woman. Moreover, Stark provided the jury with a frame-

such testimony either in whole or in part. It's up to you as triers of the facts to determine whether such testimony was credible and whether and how it applies to the case. It's for you to consider the testimony with the other circumstances in the case and using your best judgment determine whether you will give it any weight and, if so, what weight you will give to it."

work within which it could place and possibly explain the victim's behavior, which is within the accepted role of an expert witness. See *State* v. *Vega,* supra, 259 Conn. 396.

Our review of the record leads us to conclude, therefore, that Stark's testimony did not invade the province of the jury in assessing LeJeune's credibility, especially in light of the court's limiting instruction to the jury.[14] Accordingly, the court did not abuse its discretion in admitting Stark's testimony.

## IV

Finally, the defendant claims that the prosecutor made improper comments during closing and rebuttal arguments to the jury that were "so pervasive and egregious" that they violated the defendant's federal and state constitutional rights to a fair trial. Specifically, the defendant claims that the prosecutor improperly (1) expressed his personal opinion as to the evidence, (2) expressed his personal opinion as to the defendant's guilt, (3) referred to facts not in evidence and (4) appealed to the jury's emotions.

The defendant concedes that he failed to preserve properly those claims at trial; however, he nonetheless maintains that they are reviewable under either *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[15]

---

[14] See footnote 13.

[15] Pursuant to *State* v. *Golding,* supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) "In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances. . . . The first two questions relate to whether a defendant's claim is reviewable, and the last two relate

or the plain error doctrine. Practice Book § 60-5.[16] We will review the defendant's claims under *Golding* because the record is adequate to do so and an allegation of prosecutorial misconduct in violation of a fundamental right is of constitutional magnitude. We conclude, however, that the challenged comments did not deprive the defendant of a fair trial and, therefore, that his claims fail under the third prong of *Golding*.

"[P]rosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Internal quotation marks omitted.) *State v. Burton*, 258 Conn. 153, 165, 778 A.2d 955 (2001). "[T]o deprive a defendant of his constitutional right to a fair trial . . . the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Internal quotation marks omitted.) *State v. Jefferson*, 67 Conn. App. 249, 266, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002).

"In order to determine whether claims of prosecutorial misconduct amounted to a denial of due process, we must decide whether the challenged remarks were improper, and, if so, whether they caused substantial prejudice to the defendant. . . . In conducting our analysis, we focus on several factors: (1) the extent to

to the substance of the actual review." (Citation omitted; internal quotation marks omitted.) *State v. Jordan*, 64 Conn. App. 143, 150, 781 A.2d 310 (2001).

[16] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

which the misconduct was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Garrett*, 42 Conn. App. 507, 515–16, 681 A.2d 362, cert. denied, 239 Conn. 928, 929, 683 A.2d 398 (1996). With those principles in mind, we review the defendant's claims of prosecutorial impropriety.

A

The defendant first claims that the prosecutor improperly expressed his personal opinion as to the evidence. Specifically, the defendant challenges three separate comments made by the prosecutor during closing and rebuttal arguments. We will address each comment in turn to determine whether the particular comment was improper and whether the impropriety, if any, deprived the defendant of a fair trial.

The following additional facts are necessary for our resolution of the defendant's claim. During the trial, the defendant offered into evidence three letters[17] that he claimed LeJeune had written to him while he was incarcerated after his arrest on the charges in the present case. During cross-examination, defense counsel questioned LeJeune as to whether she wrote the letters. LeJeune admitted to writing one of the letters, but denied writing the other two.[18] Thereafter, the defen-

---

[17] The letters were admitted into evidence as court exhibits two, three and four. They were not admitted substantively, but rather were admitted to assist the jury in understanding the expert testimony that was presented with respect to the letters' authenticity.

[18] In the letter that LeJeune admitted having written, she stated, inter alia, that she still loved the defendant, that she missed him, that she wanted to forgive him, that she had put him in his then present situation, that she wanted him to take her back and that she belonged to him.

dant presented expert testimony from Clarissa DeAngelis, a certified document examiner. DeAngelis testified that she examined the three letters and, in her opinion, that they all had been written by the same person. In rebuttal, the state presented expert testimony from Kenneth Zercie, a criminalist for the state police forensic laboratory, who testified that he examined the same three letters and, in his opinion, exhibit two, the letter that LeJeune admitted writing, was not "authored" by the person who authored the other two letters.

The defendant first contends that the prosecutor improperly expressed his opinion by vouching for the credibility of Zercie's testimony when he commented to the jury as follows: "And then these phony letters that come up that are in evidence, these two forgeries to try to tell you that, oh, it was somebody else, some crack-head somewhere who did it."

"[I]t is well established that the evaluation of [witnesses'] testimony and credibility are wholly within the province of the trier of fact." (Internal quotation marks omitted.) *Hoffer* v. *Swan Lake Assn., Inc.*, 66 Conn. App. 858, 861, 786 A.2d 436 (2001). "It is axiomatic that [t]he prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. (Internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 274, 780 A.2d 53 (2001).

Here, despite the prosecutor's indelicate use of the terms "phony" and "forgeries," he did not vouch for the credibility of Zercie's testimony.[19] The prosecutor

[19] We do not endorse the prosecutor's indelicate use of the terms "phony" and "forgeries." It must be noted, however, that the jury already had before it the term "forgery." That occurred during the defendant's testimony on his motion to suppress, a transcript of which was before the jury. At the hearing, the defendant, when asked whether he had "forged" Montgomery's signature on the Yorkshire Street apartment lease, admitted that he did

neither personally guaranteed the credibility of the testimony nor implied that he had special knowledge outside the record. Viewed in context, the prosecutor's comment refer to matters in evidence. "[A] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Holmes*, 64 Conn. App. 80, 93, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001). Moreover, "[b]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument." (Internal quotation marks omitted.) *State* v. *Hampton*, 66 Conn. App. 357, 373, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001). We therefore conclude that the prosecutor's comment was not improper.

The defendant also contends that the prosecutor improperly expressed his opinion as to the evidence by describing the letters offered by the defense as "contrived" and "phony," and by stating, "I think she's mistaken," in reference to DeAngelis' testimony.[20]

"sign" Montgomery's name on the lease. Also, LeJeune had testified that she watched the defendant practice writing Montgomery's signature before he signed the lease.

[20] The prosecutor commented in relevant part: "I mean, that's—that's, there's no dispute about that. So, who's contrived? *He's contrived.*

*"These letters are contrived.* Poor Mrs. DeAngelis. I feel sorry for her. She's sick. She's given this job, he pays her a certain amount of money, she doesn't even get all the exhibits. Three letters. She doesn't even get to look at them. Oh, make your decision based upon these three letters only, two of which are, he claims, written by [LeJeune]. That's all she's got. . . .

"But she did not look at the three letters, two of which you will have. And you can see the repetition of the language that's used in those letters and used in those phony letters.

"Ken Zercie comes in here. He's a member of the state police forensic laboratory. And he testifies for you. And he has that little card thing that [DeAngelis] made up and tells you it doesn't add up. He goes through it line by line. It doesn't work. *I think she's mistaken.* She didn't have all the exhibits to look at." (Emphasis added.)

Here, again, despite his indelicate use of the term "phony," the prosecutor merely was commenting on inferences drawn from Zercie's testimony and, therefore, the prosecutor's comment was not improper. Also, it was defense counsel who introduced the term "contrive" into the case by stating to the jury during his closing argument: "I have to tell you that, frankly, I think that this prosecution was the most *contrived*, corrupt prosecution I've ever seen with my own two eyes anywhere." (Emphasis added.) Thus, by using the term "contrive," the prosecutor was responding to an argument invited by the defendant. Although it was improper for the prosecutor to state, "I think she's mistaken," the court minimized the prejudicial effect of any impropriety by promptly warning the prosecutor not to inject his opinion into the argument.[21] We therefore are not persuaded that the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process.

Finally, the defendant contends that during rebuttal argument, the prosecutor improperly expressed his opinion as to the evidence by describing the letters offered by the defense as "phony" and "basically distaste," and by stating that the defendant's assertion that LeJeune did not live with the defendant in the apartment was "utter nonsense."[22]

[21] The court stated the following: "Okay, counsel, I will give you the same instruction that I gave [defense counsel about] not injecting your own opinion." In response, the prosecutor immediately corrected his improper comment by stating, "I submit to you that she was mistaken," which further minimized the effect of any impropriety. See *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 400, 726 A.2d 657 ("mere use of phrases such as 'I submit,' 'I find,' or 'I believe' does not constitute improper argument"), cert. denied, 249 Conn. 920, 733 A.2d 233 (1999).

[22] The prosecutor commented in relevant part: "And he quickly moved to another subject because she picked out the real genuine letter immediately and spotted the two phony letters. And that—those two phony letters are basically distaste. He says to you, because of those two phony letters, there's reasonable doubt. That's his case. And I say to you, you have to reject at hand those two phony letters. . . ."

The prosecutor's comments arose in reference to defense counsel's changing his line of questioning after LeJeune, upon being shown the three letters that she allegedly wrote to the defendant, admitted that she wrote one of the letters, but denied that she wrote the other two. The prosecutor referred to the later two letters as "phony" and "basically distaste."

We again conclude that despite the prosecutor's indelicate use of certain terms, his comments, when viewed in context, reflect reasonable inferences from the evidence adduced at trial, namely, the defendant's dependence on two questionable letters to show reasonable doubt. Also, in arguing that the jury should reject as "utter nonsense" the defendant's claim that LeJeune did not live with him in the apartment, the prosecutor merely was responding to defense counsel's argument to the jury that it was "wholly unbelievable, and just made up out of whole cloth . . . that [LeJeune] lived with [the defendant]." Furthermore, the court minimized the prejudicial effect of any improper expression of opinion by the prosecutor by sternly warning both counsel in front of the jury not to inject their opinions into the argument.[23] We therefore are not persuaded

"I mean, this suggestion of his that she didn't live at the apartment for those two weeks, I mean, that's utter nonsense. How many people do we have to have testify that she did. And he maintains yet that she didn't. How does she know what it looks like? How is she able to identify the interior of the apartment if she never lived there? . . . I submit the only way she's going to know that is [by] having been there. That's how she knows. So, this suggestion she never lived there, I mean, that's utterly preposterous."

[23] The court stated in relevant part: "And I would say to both counsel, I would urge in your arguments to follow the rules that you not suggest your own opinion as to what the jury should or should not do. And this is directed to both lawyers. There was not anything egregious. Both of you did have a tendency to do that.

"Members of the jury, the lawyers are not to tell you what they believe. They're allowed to tell you what—what they're allowed to tell you is what they believe the evidence suggests, but not in terms of their own opinions. So, they're not allowed to suggest their opinions."

Also, during its final instruction to the jury, the court stated: "The arguments and statements made by the lawyers, including statements made

that the prosecutor's comments rose to the level of egregiousness or so infected the trial with unfairness as to make the conviction a denial of due process. Accordingly, the defendant's claim is without merit.

B

The defendant next claims that the prosecutor improperly expressed his personal opinion as to the defendant's guilt by making the following two comments: (1) "So, when you come to court with these letters and say, oh, I have letters from [LeJeune], that somebody else did, unnamed, we know who to—who the forger is"; and (2) "But he does tell you another thing, and that is that those two letters are written by the same person, not [LeJeune], but by the same person, and I think we all know who that is."[24]

"We acknowledge that it is improper for a prosecutor to express his or her opinion, directly or indirectly, as to a defendant's guilt." *State* v. *Moore*, 65 Conn. App. 717, 724, 783 A.2d 1100, cert. denied, 258 Conn. 940, 786 A.2d 427 (2001). We also recognize, however, that advocates must be allowed latitude in argument to accommodate for the zeal of counsel in the heat of argument. See *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 399–400, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999).

In the present case, the prosecutor's allusion to the "forger" and his implication that the defendant forged

during their closing arguments, are not evidence. The lawyers are not witnesses. . . .

"The opinions or beliefs of the lawyers are not evidence. That's why I told the lawyers during their closing arguments to remember not to use language in their summations that suggested or stated their personal views or opinions. It's only your view, as the triers of fact, of the evidence that counts, only what you believe or do not believe, find or do not find, that matters."

[24] The prosecutor made the first comment in his closing argument and the second comment in his rebuttal argument.

the two letters was improper, even though the jury was aware, both from the evidence and the court's instructions, that the defendant was not on trial for forgery. Although improper, viewed in the context of the entire trial, the prosecutor's isolated comments were not so blatantly egregious as to cause substantial prejudice to the defendant. Accordingly, we conclude that the prosecutor's comments did not deprive the defendant of a fair trial.

## C

The defendant next claims that the prosecutor improperly referred to facts not in evidence during his closing argument. Specifically, the defendant argues that the prosecutor improperly commented on the substantive content of two letters that were admitted for the limited purpose of assisting the jury in resolving the issue of the letters' authenticity and not for substantive use.[25]

"[I]n fulfilling his duties, the prosecutor must confine the arguments to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony that is not the subject of proper closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 263.

---

[25] The prosecutor commented in relevant part: "The letters. You heard two letters. You will get those letters. They're admitted to show you what her handwriting looks like along with the third letter that's already in [evidence]. But I think there's something more than that—than those letters, when you read them. If you remember when Dr. Stark testified about battered woman syndrome, and how there's isolation and how one man becomes the woman's world and how everything revolves around him, and she does everything for him and yet he comes out with these irrational, violent attacks on her. So, when you read the letters, you can see her asking him, 'Why did you do this to me?' 'It had to be my fault,' she says. Why? Because that's how [she has] been trained. [She has] been trained by him. Kneel in the corner nude until I tell you to stop. And she does, for hours. And yet she professes her love for him, which is the other side of that coin, which is what Dr. Stark was talking about, how she blames herself for everything."

Strictly speaking, the prosecutor's comments were improper because he referred to the substance of "[t]he letters," despite initially acknowledging that two of the letters were admitted into evidence for a limited purpose. Presumably, when he briefly discussed what the jurors might "see" when they read "[t]he letters," he was referring only to the "third letter," which already had been admitted into evidence without limitation.[26] Indeed, on a number of occasions, counsel for both parties referred generically to "the letters," and, therefore, to matters not strictly in evidence.[27] Nevertheless, the prosecutor's reference to the substance of the collective letters was improper.

Although technically, the prosecutor's comments were not appropriate, we are not persuaded that when they are viewed in the context of the entire trial, they are so egregious as to have deprived the defendant of a fair trial. Given the court's strong limiting instruction, both at trial and during its final instructions to the jury, as to the proper use of the letters,[28] the prejudicial effect

---

[26] That letter was the one that LeJeune admitted to having written, i.e., exhibit two.

[27] For example, in his closing argument, defense counsel commented in relevant part: "What really happened that night, *what really happened is contained right in the letters that she sent to* [*the defendant*]. . . . [I]t's right in there. I would submit to you, *what happened was, what she says in the letters*; she got high, she got beat up, and she was looking to blame someone else like [the defendant]. . . .

"*And look in the letters.* I mean, it comes shining right through. This is really a sick, sick girl with problems.
* * *
"[T]here could be only one verdict in this case, and that verdict is not guilty. . . . Not guilty because Carissa LeJeune tells you *in her letters* that someone else did it." (Emphasis added.)

[28] During its final instruction to the jury, the court stated: "In this case, the defendant has introduced into evidence two exhibits that he claims to be letters written by Carissa LeJeune, defendant's exhibits three and four, that she denies writing. If you find that Ms. LeJeune did in fact write those letters, you may consider those letters as substantive evidence; that is, not just to cast doubt at her credibility at trial by discrediting her testimony, but also as evidence of what's said in those letters [as] true in determining the question of a defendant's guilt or nonguilt. Since the authenticity of

of the prosecutor's improper comments was minimal. See *State* v. *Sauris*, supra, 227 Conn. 403 ("[j]urors are presumed to have followed the instructions of the court as to the law in the absence of a clear indication to the contrary"). Moreover, LeJeune's relationship with the defendant, his treatment of her, as well as her protestation of her feelings for him, fairly viewed, were evidence that was already admitted into evidence at trial. Accordingly, we conclude that the prosecutor's comments did not deprive the defendant of a fair trial.

## D

Last, the defendant claims that the prosecutor improperly appealed to the jury's emotions and sympathies during closing argument. Specifically, the defendant takes issue with the following comment: "If this cycle of violence has to stop, and you have the power, and in this particular case to stop it, you have the power to say to this defendant, no more, you cannot treat another human being like you treated her, our society won't permit it."

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 719, 793 A.2d 226 (2002).

these two letters is in dispute, however, before you would consider those letters at all, you would first have to decide that the evidence established that she had written them. Only if you do find that she wrote these letters may you consider such evidence either for the purpose of impeachment, as I explained that term to you, or substantive evidence of what happened."

After a careful review of the record, we conclude that the prosecutor's comment on the "cycle of violence" properly was based on evidence presented at trial. Viewed in context, the challenged comment did not "divert the jury's attention away from deciding the case on the evidence," as the defendant contends; rather, it merely suggested that "if" the jury found that the cycle of violence existed and that it should be stopped, then that could be reflected in the verdict. It is important to note that not only did the prosecutor begin the challenged comment with the qualifier "if," but immediately following the comment the prosecutor continued, "I'm going to ask you *based upon the evidence that you heard in this case, and only that evidence,* to bring back guilty verdicts on each of these counts." (Emphasis added.)

It is the prosecutor's duty to see that justice is done and to use any legitimate means to accomplish that, including persuading the jury that its verdict will accord with justice. See *State* v. *Copas,* 252 Conn. 318, 336, 746 A.2d 761 (2000). Moreover, it is well settled that "in addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Robinson,* 227 Conn. 711, 746, 631 A.2d 288 (1993). We perceive no proscribed appeal to the jury's emotions and sympathies and, therefore, the defendant's misconduct claim is without merit.[29]

---

[29] In so concluding, we note that *State* v. *Mills,* 57 Conn. App. 202, 748 A.2d 318, cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000), which the defendant cites in support of his claim, is vastly different on its facts. Furthermore, unlike in *Mills,* the prosecutor in this case did not express the "opinion that society would be in trouble if the defendant were not found guilty . . . ." Id., 207.

## E

Finally, we consider whether the cumulative effect of the prosecutor's improper comments so infected the proceedings as to deprive the defendant of his right to a fair trial. As previously stated, that final determination requires the consideration of several factors: The extent to which the misconduct was invited by defense conduct or argument, the severity of the conduct, the frequency of the conduct, the centrality of the misconduct to the critical issues of the case, the strength of the curative instructions adopted and the strength of the state's case. See *State* v. *Garrett*, supra, 42 Conn. App. 515. We conclude that the defendant was not deprived of a fair trial.

Our examination of the entire record discloses that this was, to say the least, a spirited trial. Indeed, much of the indelicacy of the prosecutor's comments was in response to defense counsel's equally indelicate comments[30] and, therefore, the prosecutor's misconduct, for

---

[30] In closing argument, defense counsel commented in relevant part: "But I have to tell you that, frankly, I think that this prosecution was the most contrived, corrupt prosecution I've ever seen with my own two eyes anywhere. And you know what I mean. I'm talking about the leading questions, the coached witnesses, the questions that suggested answers, the scripted testimony of some of the witnesses, the undisclosed letters. That's what I'm talking about.

\* \* \*

"The next line of testimony, next segment of [LeJeune's] testimony, which I would suggest to you based upon this record is just wholly unbelievable and just made up out of whole cloth, is that she lived with [the defendant].

\* \* \*

"Two, I think three times [LeJeune] was asked where did she move to, where did she move to, and finally, as if on cue, she says, oh, she moved in with [the defendant]. It's coached testimony. It's not believable. This is just not evidence that she ever lived in that apartment.

\* \* \*

"You have [LeJeune's] friends. . . . They were coached witnesses. They were there, they wanted to help [LeJeune].

"I mean, you saw [Ogilny]. She was asked how did [the defendant] treat [LeJeune]? Okay. Fine. How did he treat her? Oh, oh, that, that he, you know, hit her. She was coached.

the most part, was invited by defense counsel's conduct and argument. Also, the prosecutor's misconduct was infrequent and certainly not representative "of a pattern of conduct repeated throughout the trial." (Internal quotation marks omitted.) *State* v. *Tweedy*, 219 Conn. 489, 509, 594 A.2d 906 (1991). Moreover, because none of the improprieties was egregious and because they referred to secondary or collateral issues, the prejudicial effect of the comments was minimal at most, especially in light of the state's particularly strong case.[31]

It also is noteworthy that the prosecutor's comments that the defendant now claims were improper apparently were not so obviously prejudicial as to evoke a contemporaneous objection from defense counsel at trial. "[I]t seems strange that, if the state's comments were as egregious at trial as they have been depicted on appeal, no contemporaneous objection was made." *State* v. *Marra*, 222 Conn. 506, 535 n.15, 610 A.2d 1113 (1992); see also *State* v. *Satchwell*, 244 Conn. 547, 572, 710 A.2d 1348 (1998) ("because the defendant made no

---

\* \* \*

"And what does the state do in response to [DeAngelis'] expert testimony? I mean, they don't even have the decency to go out and retain an independent expert. That's how little they respect the process. . . . They go, instead of hiring an independent person, which they could do, they just call up the state police [laboratory], send us someone down. . . . Someone who has been working . . . for the state police for fifteen years. Is there any surprise about what his answers are going to be, really? Really. . . .

"What is the Torrington police department's response to [LeJeune's] complaint? I mean, even for the Torrington police, this is woefully inadequate.

\* \* \*

"We've come so much further than to do something here that would leave a stain on the criminal justice system to convict someone, a fellow human being, on such a shabby case that lacks credible evidence. I just think we're better than that."

[31] At trial, LeJeune testified at length with respect to each criminal act charged and was vigorously cross-examined. The state produced a number of witnesses, including police, whose testimony corroborated LeJeune's testimony. The physical evidence in the case also supported LeJeune's claims.

objection to the statements at trial, we may presume that he did not consider [them] to be seriously prejudicial at the time they were made"). Finally, the court's strong and clear instructions to the jury were sufficient to mitigate any possible harmful effect of the misconduct.[32]

We conclude that because most of the challenged comments were appropriate and any improper comments, taken as a whole, were not sufficiently pervasive to have established a pattern of misconduct or so blatantly egregious that they infringed on the defendant's right to a fair trial, the cumulative effect of the challenged comments did not clearly deprive him of a fair trial. Accordingly, the defendant's claims of prosecutorial misconduct fail under the third prong of *State* v. *Golding*, supra, 213 Conn. 239–40.[33]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[32] See footnote 23.

[33] In the alternative, the defendant seeks review under the plain error doctrine. See footnote 16. We recently have restated that "[t]o prevail under the plain error doctrine, the defendant must demonstrate that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . . This doctrine is not implicated and review of the claimed error is not undertaken unless the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Silva*, 65 Conn. App. 234, 243–44, 783 A.2d 7, cert. denied, 258 Conn. 929, 783 A.2d 1031 (2001). As our disposition of the defendant's claim under *Golding* makes clear, we do not find that the alleged improprieties implicate such concerns.