# STATE OF CONNECTICUT *v.* ANTHONY L. FAVOCCIA, JR.
## (AC 30266)

DiPentima, Gruendel and Lavery, Js.

Argued October 22, 2009—officially released January 19, 2010

*Gary A. Mastronardi*, for the appellant (defendant).

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *Jonathan C. Benedict*, former state's attorney, and *Cornelius P. Kelly*, senior assistant state's attorney, for the state (appellee).

*Opinion*

GRUENDEL, J. The defendant, Anthony L. Favoccia, Jr., appeals from the judgment of conviction, rendered after a jury trial, of two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[1]

---

[1] General Statutes § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts . . . of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony . . . ."

He claims that the trial court abused its discretion in permitting the state to offer certain expert testimony that allegedly bolstered the credibility of the victim in the present case. We agree and, accordingly, reverse the judgment of the trial court.

From the evidence adduced at trial, the jury reasonably could have found the following facts. The events underlying the defendant's conviction occurred in the fall of 2005 and the summer of 2006. At that time, the victim, D, was under sixteen years of age.[2] Following the divorce of her parents when she was three years old, the victim resided with her mother, S. The victim regularly spent weekends with her father, R, pursuant to a court approved visitation schedule.

The defendant was a longtime friend of R, whom the victim had known since early childhood as "Uncle Tony." During one of her weekend visits with R in the fall of 2005, the defendant spent the night at R's residence. R worked an overnight shift as a 911 operator that evening. After R departed the residence and his girlfriend, M, had gone to bed, the defendant entered the victim's bedroom and lay next to her. The defendant kissed her neck and touched her back, stomach, upper legs and buttocks. The encounter ended abruptly after approximately fifteen minutes, and the defendant told the victim that he would "[s]ee [her] tomorrow . . . ." The victim thereafter did not report that incident to her parents. She did, however, inform two classmates and close friends, J and B, of her encounter with the defendant. Although the victim instructed J and B to keep the matter secret, they encouraged the victim to report the incident to her mother.

---

[2] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

A second incident involving the defendant and the victim occurred in the summer of 2006, during another weekend visit at R's residence. On that particular evening, the defendant was present when R, a volunteer firefighter, left the residence to respond to a fire. At that time, the victim took a shower and then retreated to her bedroom robed in a towel. After she closed the door, the defendant suddenly entered the room. As the victim testified, "he [got] on top of me and started kissing me on my neck . . . well, first it was on the lips and then my neck. . . . [H]e was on top of me, my towel had started to come off . . . I guess because of being on top of me, and it was not a relatively big towel, and he was . . . touching on my sides and everything and then . . . after maybe five, ten minutes, I told him that I needed to get dressed and that he needed to leave, so he had to get off of me." The defendant complied with her request. The victim did not report the incident to her parents but did inform J and B of the encounter, who again encouraged the victim to report the incident to her mother. The victim falsely assured her friends that she had done so.

One year later, S finally learned of the incidents involving her daughter and the defendant. On that evening in late June or early July, 2007, S overheard the victim, J and B talking about a recent incident in which the defendant attempted to "[look] down [the victim's] shirt . . . ." J then recounted to S the details of the victim's two encounters with the defendant in the fall of 2005 and summer of 2006, and the victim began to cry. Shocked, S took the victim, J and B to the Stratford police department to report the incidents.

The defendant thereafter was arrested and charged, by amended information dated May 29, 2008, with one count of sexual assault in the second degree in violation

of General Statutes (Rev. to 2005) § 53a-71 (a) (1),[3] one count of sexual assault in the fourth degree in violation of General Statutes (Rev. to 2005) § 53a-73a (a) (1),[4] and two counts of risk of injury to a child in violation of § 53-21 (a) (2). A jury trial followed. The state's case included testimony from the victim, J and B, and two exhibits. In addition, the state presented the expert testimony of psychologist Lisa Melillo. The defense consisted of testimony from R, M and E, the victim's high school color guard coach, as well as four exhibits. Following the close of evidence, the defendant moved for a judgment of acquittal. The court granted that motion as to the sexual assault in the fourth degree count only, concluding that the state had not proven beyond a reasonable doubt that the victim was under the age of fifteen at the time of the alleged incidents. The matter was submitted to the jury, which found the defendant guilty on both counts of risk of injury to a child. The jury further informed the court that it was "deadlocked on the issue of sexual assault in the second degree" and saw "no possibility of unanimity on this issue." The court thus declared a mistrial on that count. The court rendered judgment accordingly and sentenced the defendant to a total effective term of twenty years incarceration, execution suspended after ten years, with twenty-five years of probation.[5] This appeal followed.

On appeal, the defendant maintains that the court abused its discretion in permitting the state to offer

[3] General Statutes (Rev. to 2005) § 53a-71 (a) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . ."

[4] General Statutes (Rev. to 2005) § 53a-73a (a) (1) provides in relevant part that a person is guilty of sexual assault in the fourth degree when "[s]uch person intentionally subjects another person to sexual contact who is . . . (A) under fifteen years of age . . . ."

[5] The defendant's probation was subject to numerous special conditions, including registration as a sexual offender.

certain expert testimony that vouched for and bolstered the credibility of the victim. He focuses on four colloquies between the prosecutor and Melillo in which Melillo allegedly conveyed to the jury her opinion that the victim had suffered sexual abuse. The state argues that the defendant's claim is unpreserved in part, that the court did not abuse its discretion in admitting Melillo's expert testimony and, alternatively, that the defendant has failed to demonstrate harm stemming from any abuse of that discretion. On the particular facts of this case, we agree with the defendant.

## I

## FACTS

The following additional facts are relevant to our review. Prior to trial, the state disclosed a list of potential witnesses. That disclosure stated in relevant part: "Lisa Melillo [to] testify as to characteristics of children who claim they were sexually abused." At trial, the state commenced its case-in-chief with the testimony of the victim, followed by the constancy of accusation testimony of J and B. The state then called Melillo to the witness stand.

That testimony began with a recitation of Melillo's qualifications. Melillo testified that she is "a nationally certified school psychologist, which is the highest level of certification in the practice of school psychology." She testified that she had been a full-time school psychologist for twenty-one years. In addition, Melillo had seven years of experience as a forensic interviewer, during which she has conducted "between 150 and 160 interviews . . . ."[6] Melillo attested to her ample training as a forensic interviewer, which involved instruction

---

[6] In her testimony, Melillo explained that a forensic interview "is a structured or semistructured interview process that is neutral, objective and fact-finding. It's to have a child, whether it be a child or adolescent, sit down with an interviewer who is trained to ask nonleading questions to be able to report their experiences or abuse."

with respect to behavioral characteristics of children who claimed to have been sexually abused. Her professional training included participation in the CornerHouse model in Minneapolis, Minnesota, the Beyond Finding Words program in Indianapolis, Indiana, and a related program in Huntsville, Alabama, as well as "various trainings" in Connecticut. Melillo testified that she was "very involved in the Finding Words" training program, serving as both trainee and trainer. She explained that Finding Words is "a weeklong program, and part of it is certainly the interview protocol itself, but it's the whole aspect of child abuse, child sexual abuse, investigation stemming from the role of law enforcement, the role of child protective services, the department of children and families, being able to understand the dynamics or the behavioral characteristics of the children who experience abuse, prosecution for the children who have been abused, and so . . . it's a full program package." In addition, Melillo testified that she was part of the multidisciplinary investigative team at the Center for Women and Families of Greater Bridgeport.

Melillo testified that she had not interviewed or spoken with the victim in the present case. Rather, she reviewed certain police reports and a report prepared by Donna Vitulano, her colleague at the Center for Women and Families of Greater Bridgeport, who had conducted a forensic interview with the victim.[7] Melillo testified that she watched the video of that forensic interview twice.[8] In addition, Melillo testified that she had spoken with the prosecutor about the case prior to the commencement of trial. She opined that her testimony at trial was predicated on her review of "the

---

[7] Vitulano's report was not offered into evidence at trial.

[8] The video was introduced into evidence by the state. Following Melillo's testimony, the jury viewed that video as the concluding part of the state's case-in-chief.

documents, [her] discussions [with the prosecutor] and the DVD."

In this appeal, the defendant challenges the admission of opinions expressed by Melillo in four separate colloquies with the prosecutor. We detail the pertinent portions of each in turn.

## A

### First Opinion

The first challenged opinion concerns Melillo's testimony that the present case involved an accidental disclosure of sexual abuse:

"[The Prosecutor]: . . . What types of disclosures are there?

"[The Witness]: They can be accidental disclosures. They can be purposeful disclosures. . . .

"[The Prosecutor]: . . . What is an accidental disclosure?

"[The Witness]: An accidental disclosure is a situation where a child has decided never to talk about their experiences for various reasons, but, despite the efforts of that child to keep this . . . to themselves, it has come out by an accident, by a discovery process outside of themselves.

"[The Prosecutor]: And you mentioned the term purposeful?

"[The Witness]: Purposeful disclosure is exactly what it sounds like. The child has made a conscious decision to tell someone who can stop it or do something about it. . . .

"[The Prosecutor]: Upon your review of the documents in this case and the video that you reviewed . . .

would you state for us whether this was an accidental or purposeful disclosure on the part of [the victim]?

"[Defense Counsel]: Objection, Your Honor. . . . [F]or her to express an opinion as to whether it was purposeful or not, I think would run counter . . . to someone in her position making a statement about the credibility of a witness in this case, which is prohibited by . . . *State* v. *Grenier*, 257 Conn. 797, 778 A.2d 159 (2001), and other cases cited in the opinion, including *State* v. *Ali*, 233 Conn. 403, 433, 660 A.2d 337 (1995), and talking about a particular alleged victim. This witness should not be allowed to answer questions about the credibility and the definition of what that person is alleged to have done, putting some kind of stamp of approval on it.

"The Court: All right. The objection is overruled. The witness is absolutely not allowed to testify as to credibility, but she is an expert and can render an opinion, and the jury is entitled to give it whatever weight [it] deem[s] appropriate based on her expertise. . . .

"[The Prosecutor]: With respect to your formal review of the documents, and I believe you said you looked at the DVD of [the victim's forensic] interview, can you render an opinion whether her disclosure was an accidental disclosure or a purposeful disclosure?

"[The Witness]: I can render an opinion. . . . My opinion is, it was an accidental disclosure.

"[The Prosecutor]: Why is that?

"[The Witness]: Okay. When I was reviewing the videotape of [the victim], it was my understanding that she had not wanted to tell someone in a position of authority, a parental, parental figure, what was happening. She had shared it with some girlfriends in confidence, and they said they wouldn't say anything, which we all know teenagers do . . . . It was my opinion, as

I said before, that it was my understanding that she did not intend to tell, make a purposeful disclosure, and so she shared it with some friends and it came out by accident.

"[The Prosecutor]: Okay. . . . In addition to some of the documents that you reviewed and the DVD that you reviewed, have you had an opportunity before the trial started to speak to me about the case as well?

"[The Witness]: I have."

## B

### Second Opinion

The second challenged opinion concerns Melillo's testimony that the present case involved a delayed disclosure of sexual abuse:

"[The Prosecutor]: Is it an unusual or usual situation that a child would refrain from telling someone in authority about the abuse?

"[The Witness]: It would be—

"[Defense Counsel]: Objection, Your Honor.

"The Court: Overruled. . . .

"[The Witness]: It is my experience [that] it is more typical for them not to share it with somebody who can be in a position to intervene.

"[The Prosecutor]: Is there a term associated with that type of disclosure?

"[The Witness]: There is. . . . It's called delayed disclosure.

"[The Prosecutor]: Okay. And what is that?

"[The Witness]: Again, we talk about the word disclosure, about it being a report or statement from the child. Oftentimes, we believe that kids just automatically tell,

but what we found is, it's just the opposite. They . . . either delay in reporting it or they never tell at all. So, the process of disclosure . . . is not one event. It's a process. And delayed disclosures are also found out, people report things that have happened in the past to them.

"[The Prosecutor]: And in this particular case, upon reviewing the documentation, as well as the DVD, what is your opinion with respect to whether or not [the victim] engaged in this process that you're talking about, delaying her disclosure?

\* \* \*

"[The Witness]: My opinion is [that] she did fit the characteristics of a delayed disclosure."

C

Third Opinion

The third challenged opinion concerns Melillo's testimony that, as a coping mechanism, the victim remained polite and respectful to the defendant following the incidents:

"[The Prosecutor]: Now, also in your training, experience, as well as the literature that exists in the field, is it possible for a child to continue to show signs of respect toward the abuser after the abuse has occurred?

"[The Witness]: Yes, that is very possible.

"[The Prosecutor]: Okay. And why is that?

"[The Witness]: Oftentimes, if a child has made a decision not to tell anybody and wants to keep this within themselves, they have to cope somehow to maintain that, and if they either act differently than what they are typically doing or don't act in a certain way, that can bring, you know, some suspicion. So, if a person's conduct, a child's conduct, is typically respectful and

polite to someone, if they should suddenly change, that might arouse suspicion and then being asked questions, sending a flag to somebody, saying, what's the matter, why aren't you nice to that person anymore. That is a coping method to accommodate keeping that inside them.

"[The Prosecutor]: And did you see any evidence of that in your review of the documentation and, or, the DVD?

"[Defense Counsel]: Objection, Your Honor. It goes to . . . what's in the mind of the . . . person who is being talked about, and it reflects—

"The Court: He said documentation as well as the DVD, [defense counsel]. Overruled. She is an expert rendering an opinion, and I'm sure you will be cross-examining her on her opinions.

"[Defense Counsel]: It goes to the credibility issues, Your Honor.

"The Court: It does not, [counsel]. It is an opinion.

"[The Prosecutor]: Miss Melillo? . . .

"[The Witness]: [A]s I viewed the videotape, again . . . I saw her talk about how she, you know, was raised to be polite and respectful and wasn't going to change that behavior . . . in a situation like that."

## D

### Fourth Opinion

The fourth and final challenged opinion concerns Melillo's testimony that, as a coping mechanism, the victim attempted to make herself unattractive to the defendant:

"[The Prosecutor]: Have you . . . ever encountered in your dealings as a forensic interviewer, as well as a

school psychologist, behavioral issues or behaviors that young ladies may engage in to address issues of their contact with the abuser?

"[The Witness]: Yes, I have. . . .

"[The Prosecutor]: Did you see any examples of this, whether it be by the documentation or the DVD that you viewed?

"[The Witness]: I did see—

"[Defense Counsel]: . . . Objection, Your Honor. There's an allegation. This case is an allegation. [The prosecutor] is now using the language that I previously objected to. That is an assumption that there was abuse in prior cases and that she's supposed to be comparing to this case when there's an allegation and building in a presumption that the allegation is true.

"The Court: Overruled. . . .

"[The Witness]: There are many, I used the word accommodations before. There are many ways that a child or teen can cope. Typically, if a child feels kind of powerless and trapped, they might—particularly with some of the females that I work with at the high school level, have told me, I really just made myself look unattractive. . . . That [is] one of the things they can control—is how they present themselves, their appearance. So, oftentimes, they might try to make themselves look unattractive, hoping that would turn somebody away. Yes, that is a coping mechanism. That is the way of accommodating something, to be able to control a situation that they really can't control. Similar to what I have said before about changing or not changing a certain behavior to try to cope and survive in a situation.

"[The Prosecutor]: Did you note [the victim's] examples of that in the documentation or the DVD?

"[The Witness]: I did."

For convenience, we refer in this opinion to the afore-mentioned colloquies as the first, second, third and fourth opinions, respectively, unless indicated otherwise.

## II

## PRESERVATION

Before considering the merits of the defendant's claim, we first address the state's contention that it was "not entirely preserved." Our rules of practice require that a party "intending to raise any question of law which may be the subject of an appeal must either state the question distinctly to the judicial authority in a written trial brief . . . or state the question distinctly to the judicial authority on the record before such party's closing argument and within sufficient time to give the opposing counsel an opportunity to discuss the question. . . ." Practice Book § 5-2; see also Practice Book § 5-5 ("[w]henever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he or she desires it to go upon the record, before any discussion or argument is had"). It is axiomatic that issues not properly raised before the trial court ordinarily will not be considered on appeal. Practice Book § 60-5; see also *State* v. *Faison*, 112 Conn. App. 373, 379–80, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009).

The sine qua non of preservation is fair notice of the claim to the trial court. As our Supreme Court repeatedly has observed, "the essence of the preservation requirement is that *fair notice* be given to the trial court of the party's view of the governing law . . . ." (Emphasis in original.) *State* v. *Ross*, 269 Conn. 213, 335–36, 849 A.2d 648 (2004); accord *State* v. *King*, 289 Conn. 496, 505, 958 A.2d 731 (2008); *Lin* v. *National Railroad Passenger Corp.*, 277 Conn. 1, 13, 889 A.2d 798 (2006).

A secondary purpose of the preservation requirement is to prevent the possibility that an appellee "would be lured into a course of conduct at the trial which it might have altered if it had any inkling that the [appellant] would . . . claim that such a course of conduct involved rulings which were erroneous and prejudicial to him." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 48, 717 A.2d 77 (1998).

The state argues that the defendant's claim regarding the admission of Melillo's expert testimony is unpreserved with respect to Melillo's second and fourth opinions. Although the state concedes that the claim properly was preserved with respect to the first and third opinions, we nevertheless examine the defendant's initial objection at trial, which arose in response to Melillo's first opinion. Defense counsel stated: "Objection, Your Honor. . . . [F]or her to express an opinion as to whether [the victim's disclosure to S] was purposeful or not, I think would run counter . . . to someone in her position making a statement about the credibility of a witness in this case, which is prohibited by *State* v. *Grenier*, [supra, 257 Conn. 797], and other cases cited in the opinion, including *State* v. *Ali*, [supra, 233 Conn. 433], and talking about a particular alleged victim. This witness should not be allowed to answer questions about the credibility and the definition of what that person is alleged to have done, putting some kind of stamp of approval on it." Thus, in objecting to Melillo's testimony, defense counsel plainly articulated the distinct basis thereof. In so doing, the defendant apprised both the court and the state of a question of law that was a potential subject of appeal, namely, Melillo opining on the credibility of the victim. In overruling that objection, the court responded in unequivocal terms: "The witness is absolutely not allowed to testify as to credibility, but she is an expert and can

render an opinion, and the jury is entitled to give it whatever weight [it] deem[s] appropriate based on her expertise."

It is undisputed that the defendant objected to all four of the opinions now challenged on appeal. At the same time, the state emphasizes that the defendant failed to expressly predicate his objections to the second and fourth opinions on the credibility basis earlier advanced, thereby precluding our review thereof. We disagree. The purpose of the preservation requirement is to provide fair notice to the trial court and the opposing party of a question of law that may form the subject of an appeal. The transcript of the defendant's initial objection to Melillo's testimony and the court's response thereto amply demonstrates that such notice was provided in the present case. To the extent that the defendant failed to assert more clearly the particular objection he now pursues on appeal regarding the second and fourth opinions, it cannot be said to be part of a trial strategy. Cf. *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007) ("[t]o allow [a] defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal" [internal quotation marks omitted]); *Jones* v. *Ippoliti*, 52 Conn. App. 199, 205 n.12, 727 A.2d 713 (1999) ("defendants never raised this issue at trial but instead held that arrow in their appellate quiver, while reaping the benefit of a full trial"). Moreover, this court has afforded review in instances in which a party did not object to certain testimony but previously alerted the court to a precise question of law pertaining thereto. See *State* v. *Guckian*, 27 Conn. App. 225, 239 n.7, 605 A.2d 874 (1992) (because record "clearly shows that the state repeatedly alerted the trial court to the issue it now presses on appeal," failure to object to specific testimony not waiver of

state's claim as long as claim remains same on appeal), aff'd, 226 Conn. 191, 627 A.2d 407 (1993); *Sokolowski* v. *Medi Mart, Inc.*, 24 Conn. App. 276, 279–80, 587 A.2d 1056 (1991) (although defendant did not object to specific testimony, review of claim granted in light of "the trial court's previously expressed sentiment about the issue"). Given the court's ruling that "[t]he witness is absolutely not allowed to testify as to credibility" in response to his initial objection, the defendant understandably could have relied on that expressed sentiment as to subsequent opinions expressed by Melillo.

Finally, we are mindful that "a trial is not a game of technicalities, but one in which the facts and truth are sought." (Internal quotation marks omitted.) *State* v. *Allen*, 205 Conn. 370, 375–76, 533 A.2d 559 (1987). In objecting to Melillo's testimony as improper commentary on the victim's credibility, the defendant provided notice to the court and to the state of that distinct legal issue. For that reason, we disagree with the state that the defendant's claim was "not entirely preserved."

### III

### IMPROPRIETY

The defendant contends the court abused its discretion in admitting portions of Melillo's expert testimony. He claims that the challenged testimony constituted an indirect assertion on the victim's credibility.

We begin by noting the standard by which we review the trial court's determinations concerning the admissibility of evidence. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is

clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . .

"The determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims. . . . An expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact. . . . Experts can [however] sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass. . . .

"Additionally, in cases that involve allegations of sexual abuse of children . . . expert testimony of reactions and behaviors common to victims of sexual abuse is admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify as to his opinion of whether a victim in a particular case is credible or whether a particular victim's claims are truthful. . . . In this regard, we have found expert testimony stating that a victim's behavior was generally consistent with that of a victim of sexual or physical abuse to be admissible, and have distinguished such statements from expert testimony providing an opinion as to whether a particular victim had in fact suffered sexual abuse. . . .

"[E]ven indirect assertions by an expert witness regarding the ultimate issue in a case can serve inappropriately to validate the truthfulness of a victim's testimony. . . . Finally, in cases in which an expert witness reaches a conclusion on the ultimate issue in part based upon statements made by the victim . . . Connecticut case law has previously recognized the general rule of law that the expert is necessarily making a determination about the victim's credibility. . . . Such credibility determinations are more properly within the sole province of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 634–36, 881 A.2d 1005 (2005).

The defendant argues that Melillo's opinions amounted to indirect assertions on the victim's credibility, which are not permitted under Connecticut law. See *State* v. *Grenier*, supra, 257 Conn. 806. He argues that, in each, the prosecutor first elicited expert testimony from Melillo as to certain general behavioral characteristics of children who had been sexually abused and then concluded by asking Melillo to opine specifically as to whether this particular victim demonstrated those characteristics.[9] According to the defendant, when Melillo testified that the victim in the present case (1) accidentally disclosed to her mother her sexual encounters with the defendant, (2) delayed her disclosure thereof, (3) remained polite and respectful toward the defendant as a coping mechanism, and (4) attempted to make herself unattractive to the defendant as a coping mechanism, Melillo crossed the line of permissible expert testimony.

[9] Put another way, the defendant reasons that the prosecutor purposefully employed a syllogistic approach that began with a major premise—that sexual abuse victims exhibit a certain behavioral characteristic. He then proceeded to a minor premise, in which Melillo opined that she observed that characteristic in this particular victim. Left unstated is the conclusion that the victim in fact suffered sexual abuse.

The crux of the defendant's appeal is the import of those concluding portions of the four challenged colloquies between the prosecutor and Melillo. The state maintains that Melillo testified simply that the victim's behaviors were consistent with that of other victims of sexual abuse. The state further emphasizes that the prosecutor never asked Melillo to render an opinion as to whether the victim was credible but merely asked her to evaluate the victim's behavior. As to the state's latter point, we note that opinions other than literal statements as to credibility may constitute improper expert testimony. As the court recognized in *Grenier*, expert testimony that "was not a literal statement of [the expert's] belief in [the victim's] truthfulness" nevertheless may possess "the same substantive import and could be perceived as a conclusive opinion that [the victim] had testified truthfully." (Internal quotation marks omitted.) Id.

The state's principal contention, which is that Melillo simply testified that the victim's behaviors were consistent with that of other victims of sexual abuse, implicates the "critical distinction between admissible expert testimony on general or typical behavior[al] patterns of minor victims and inadmissible testimony directly concerning the particular victim's credibility." *State* v. *Spigarolo*, 210 Conn. 359, 379, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). We conclude that the challenged opinions fall on the latter side of that spectrum.

Each of the four colloquies giving rise to the challenged opinions begins with a discussion of a general behavioral characteristic of sexually abused children. In that preliminary testimony, Melillo explained that victims of sexual abuse may delay their disclosure thereof, may accidentally make such a disclosure, may remain polite and respectful toward the perpetrator as a coping mechanism and likewise may attempt to make

themselves unattractive to the perpetrator as a coping mechanism. Such expert testimony plainly is permissible. See *State* v. *Iban C.*, supra, 275 Conn. 635 ("in cases that involve allegations of sexual abuse of children . . . expert testimony of reactions and behaviors common to victims of sexual abuse is admissible"). Furthermore, such testimony served to assist the jury in evaluating the victim's conduct and whether it was generally consistent with that of a sexually abused child. See *State* v. *Freeney*, 228 Conn. 582, 592–93, 637 A.2d 1088 (1994); *State* v. *Borrelli*, 227 Conn. 153, 173, 629 A.2d 1105 (1993).

The Supreme Court has held that "where defense counsel has sought to impeach the credibility of a complaining minor witness in a sexual abuse case, based on inconsistency, incompleteness or recantation of the victim's disclosures pertaining to the alleged incidents, the state may offer expert testimony that seeks to demonstrate or explain *in general terms* the behavioral characteristics of child abuse victims in disclosing alleged incidents." (Emphasis added.) *State* v. *Spigarolo*, supra, 210 Conn. 380. Our appellate courts regularly have affirmed the admission of such general testimony. See, e.g., *State* v. *Ali*, supra, 233 Conn. 429–30 (expert testimony on general characteristics of women who delay reporting sexual assault); *State* v. *Borrelli*, supra, 227 Conn. 168–69 (expert testimony on general characteristics of battered woman's syndrome); *State* v. *Juan V.*, 109 Conn. App. 431, 437, 951 A.2d 651 (expert testimony in form of "general statement that a normal physical examination is not necessarily inconsistent with sexual abuse"), cert. denied, 289 Conn. 931, 958 A.2d 161 (2008); *State* v. *Whitley*, 53 Conn. App. 414, 421, 730 A.2d 1212 (1999) (expert testimony that "a finding of no physical injury is consistent with sexual assault"). Our courts further have permitted expert testimony in response to hypothetical questions about the behavior

of abuse victims couched in general terms. See, e.g., *State* v. *Christiano*, 228 Conn. 456, 460–63, 637 A.2d 382 (no error when expert answered hypothetical questions based on hypothetical victims in similar situation without specifically referencing victim), cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994); *State* v. *Crespo*, 114 Conn. App. 346, 370–71, 969 A.2d 231 (expert testimony that "the hypothetical victim described in questions had behaved in a manner consistent with victims of sexual assault generally" properly admitted), cert. granted on other grounds, 292 Conn. 917, 973 A.2d 1276 (2009); *State* v. *R.K.C.*, 113 Conn. App. 597, 605, 967 A.2d 115 (2009) ("[t]he hypothetical questions posed by the state used facts that properly were in evidence, did not specifically reference the victim and did not elicit from [the expert] a statement as to the victim's credibility"), cert. denied, 292 Conn. 902, 971 A.2d 689 (2009). In each case, the general expert testimony assisted the jury in answering the specific question of whether the particular victim exhibited such behavior.

Accordingly, whether the expert opined on the particular victim's behavior is a paramount consideration in evaluating challenged expert testimony. For example, in *State* v. *Freeney*, supra, 228 Conn. 590–91, two experts opined on the recollection of sexual assault victims immediately after the assault and the tendency for such victims to "go to sleep as an emotional 'coping mechanism' . . . ." Id., 591. In considering the propriety of that testimony, our Supreme Court emphasized that "[i]n this instance, neither expert gave an opinion as to whether *this particular victim* had told the truth or whether she had in fact suffered physical or sexual abuse. The expert testimony that *a victim* of sexual or physical abuse might not necessarily attempt to escape and might recount the circumstances of the abuse in a

disjointed fashion, could have assisted the jury substantially in determining the central issue in the case . . . ." (Emphasis added.) Id., 592–93; accord *State* v. *Christiano*, supra, 228 Conn. 460 (hypothetical questions posed to expert "made no specific reference to the victim" and expert testified that he "was not testifying as to the specifics of her case"); *State* v. *R.K.C.*, supra, 113 Conn. App. 605 (hypothetical questions posed to expert "did not specifically reference the victim"). In that regard, *State* v. *Yusuf*, 70 Conn. App. 594, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002), is instructive. The expert in *Yusuf* testified as to certain general characteristics of battered woman's syndrome. Id., 613–17. In deeming that testimony proper, this court stated: "[The expert] did not give his opinion as to . . . whether [the victim] in fact suffered from battered woman syndrome."[10] Id., 620.

When Melillo went beyond a general discussion of characteristics of sexual abuse victims and offered opinions, based on her review of the videotaped forensic interview and other documentation, as to whether this particular victim in fact exhibited the specified behaviors, her testimony crossed the line of permissible expert opinion. In contrast to the expert in *Yusuf*, Melillo stated her opinion as to whether the victim in fact made an accidental disclosure of her sexual encounters with the defendant and whether the victim had delayed that disclosure. Melillo opined on whether the victim, as mechanisms of coping with sexual abuse, attempted to make herself unattractive to the defendant and remained polite and respectful toward him. During her testimony at trial and in her forensic interview that was before the jury, the victim made such allegations. As a

---

[10] At oral argument before this court, the state's attorney was asked if he was aware of any similar case in which the expert was asked to opine as to the particular victim in that case. He answered in the negative.

result, Melillo's expert opinion confirming those allegations "necessarily endorsed the victim's credibility, and functioned as an opinion as to whether the victim's claims were truthful." *State* v. *Iban C.*, supra, 275 Conn. 636. Given Melillo's extensive qualifications and expertise as a forensic interviewer, the jury easily could perceive her testimony "as a conclusive opinion that [the victim] had testified truthfully." (Internal quotation marks omitted.) *State* v. *Grenier*, supra, 257 Conn. 806.

The impropriety is compounded by the fact that Melillo expressly predicated her testimony on, inter alia, her review of the victim's videotaped forensic interview.[11] When an expert bases a conclusion in part on statements made by the victim, that expert is making a determination about the victim's credibility. *State* v. *Iban C.*, supra, 275 Conn. 636; *State* v. *Apostle*, 8 Conn. App. 216, 232–33, 512 A.2d 947 (1986). This is not a case in which the expert avowed that she had not examined the victim and was not testifying as to the specifics of the case; see *State* v. *Christiano*, supra, 228 Conn. 460; or one in which the expert's "knowledge of the case was limited to the facts contained in the state's hypothetical questions." *State* v. *Crespo*, supra, 114 Conn. App. 375. In each of the four colloquies at issue, the prosecutor concluded by asking Melillo whether she observed, in the victim's forensic interview testimony, the characteristic of sexual abuse victims that was the subject of the colloquy. Melillo responded affirmatively each time. In so doing, she necessarily commented on the credibility of the victim.

The challenged opinions also are improper in that they were not beyond the ken of the average juror. Melillo properly explained to the jury four specified

---

[11] The forensic interview of the victim conducted by Melillo's colleague at the Center for Women and Families of Greater Bridgeport was more than one hour long. Melillo testified that she viewed the video of that interview twice prior to trial.

characteristics of abuse victims, of which the victim already had made detailed allegations in her testimony. For example, the victim stated in the forensic interview and testified at trial that she "tried to make [herself] look less attractive. . . . Poor hygiene, wearing clothes that didn't fit [her] right, just anything to make [her] not look attractive. . . . So maybe [the defendant] wouldn't [sexually assault her] again . . . ." In her subsequent expert testimony, Melillo stated that "[t]here are many, I used the word accommodations before. There are many ways that a child or teen can cope. Typically, if a child feels kind of powerless and trapped, they might—particularly with some of the females that I work with at the high school level, have told me, I really just made myself look unattractive. . . . That [is] one of the things they can control—is how they present themselves, their appearance. So, oftentimes, they might try to make themselves look unattractive, hoping that would turn somebody away. Yes, that is a coping mechanism. That is a way of accommodating something, to be able to control a situation that they really can't control. Similar to what I have said before about changing or not changing a certain behavior to try to cope and survive in a situation." "When inferences or conclusions are so obvious that they could be as easily drawn by the jury as the expert from the evidence, expert testimony regarding such inferences is inadmissible." *State* v. *Iban C.*, supra, 275 Conn. 639. In light of the aforementioned testimony, an assessment as to whether the victim in fact had employed that coping mechanism was well within the capabilities and understanding of the jurors. Thus, Melillo's affirmative response on that issue was unnecessary.

Had the state stopped after offering Melillo's expert testimony explaining "in general terms the behavioral

characteristics of child abuse victims"; *State* v. *Spigarolo*, supra, 210 Conn. 380; the defendant would have little complaint. Melillo's testimony, however, continued in each of the challenged colloquies to an opinion as to whether this particular victim demonstrated certain characteristics of child abuse victims in her videotaped forensic interview and other documentation, as the victim alleged in her trial testimony. In so doing, Melillo's testimony exceeded the bounds of permissible expert testimony and amounted to an indirect assertion on the victim's credibility, which Connecticut law forbids. See *State* v. *Grenier*, supra, 257 Conn. 806. We, therefore, conclude that the trial court abused its discretion in admitting that testimony in the present case.

## IV

## HARM

That conclusion does not end the inquiry. The remaining question is whether admission of the improper testimony constituted harmful error. "[T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . [I]t expressly requires the reviewing court to consider the effect of the erroneous ruling on the jury's decision. . . . Accordingly . . . a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006) (en banc).

In *Grenier*, the Supreme Court considered the following factors in conducting its harmlessness analysis. They were: (1) "[f]irst, and most important, the state's case rested entirely on [the victim's] credibility"; (2) "[t]he state neither introduced physical or medical evidence of abuse nor presented any eyewitness testimony

other than that of [the victim]"; (3) "[t]he state's case consisted of [the victim's] testimony, the constancy of accusation testimony of several witnesses and the [expert] testimony"; (4) the defendant testified and denied the allegations of abuse; (5) the improper expert testimony "struck at the heart of the central—indeed, the only—issue in the case, namely, the relative credibility of [the victim] and the defendant"; (6) "inasmuch as [the victim's] version of the events provided the only evidence of the defendant's guilt, the state's case was not particularly strong"; and (7) "[t]he testimony that the state properly adduced to underscore the expert qualifications [of its witnesses] . . . increased the likelihood that the jury would rely on their evaluations of the victim's credibility." *State* v. *Grenier*, supra, 257 Conn. 807–808. The court therefore concluded that the substantial prejudice resulting from the inadmissible expert testimony entitled the defendant to a new trial. Id., 812.

Other than the fact that the defendant did not testify at trial,[12] the *Grenier* factors all are met in the present case. As the state neither introduced physical or medical evidence of abuse, nor presented any eyewitness testimony other than that of the victim, the case rested

---

[12] The defendant possessed a constitutional right not to testify at trial. That right "is rooted in the privilege against self-incrimination under both the federal and the state constitutions. The fifth amendment to the United States constitution provides that no person shall be compelled in any criminal case to be a witness against himself. That provision acts as a restraint upon the individual states as well as the federal government under the fourteenth amendment to the United States constitution. *Malloy* v. *Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 [1964]. Article first, § 8, of the Connecticut constitution affords criminal defendants a similar protection in language at least as broad as its federal counterpart. That section, which sets forth the rights of accused persons in criminal prosecutions, provides that [n]o person shall be compelled to give evidence against himself . . . ." (Internal quotation marks omitted.) *State* v. *Yurch*, 229 Conn. 516, 521–22 n.5, 641 A.2d 1387, cert. denied, 513 U.S. 965, 115 S. Ct. 430, 130 L. Ed. 2d 343 (1994).

primarily on her credibility and, thus, was not particularly strong. Furthermore, the improper testimony concerned that central issue. Whereas *Grenier* involved only one indirect assertion by each expert as to the complainant's credibility, the expert in this case made four such assertions. Finally, the ample evidence of Melillo's expert qualifications at the outset of her testimony made it probable that the jury would rely on her indirect assertions that the victim was credible.

The state nevertheless insists that the fact that the jury deadlocked on the sexual assault in the second degree count indicates that the jury did not rely on Melillo's testimony. As it states in its appellate brief, "[h]ad the jury interpreted Melillo's opinions in the way that the defendant claims, it would have at least reached a decision on that count." We disagree. Our Supreme Court has observed that "reports of jury deadlock indicate that the fact finder itself did not view the state's case against the defendant as particularly strong." *State v. Angel T.*, 292 Conn. 262, 294, 973 A.2d 1207 (2009). As the defendant persuasively argues in light of that precept, "any claim of difficulty on the part of the jury in returning a verdict of any kind on any count . . . would demonstrate that the state's case was not a strong one, and that . . . any improperly admitted evidence could very well have been sufficient to swing the balance of the jury's deliberations in favor of conviction." Furthermore, the court in *Iban C.* rejected a claim similar to that advanced by the state: "[T]he state claims that any error associated with admitting the improper evidence was harmless because the defendant was acquitted of the more serious charges of first degree sexual assault, thus suggesting that the jurors were not overly influenced by [the expert's] testimony and had carefully weighed all of the evidence in arriving at a verdict. This claim is . . . without merit. The primary difference between the crimes of sexual assault in the

first degree and risk of injury to a child is the act of 'sexual intercourse,' or penetration of the victim's vagina. We conclude that, merely because the jury did not find, beyond a reasonable doubt, that the defendant had penetrated the victim's vagina as part of the two sexual assaults, does not establish that the jury failed to be influenced by [the improper expert opinion] in reaching guilty verdicts on the risk of injury counts. At a minimum, [the expert's improper opinion] endorsed and provided credibility to the victim's claim that some type of inappropriate contact had taken place between the victim and the defendant . . . ." *State* v. *Iban C.*, supra, 275 Conn. 644–45. That reasoning applies with equal force in the present case. Indeed, Melillo's endorsement of the victim's credibility very possibly was the deciding factor in the jury's finding of guilt on the risk of injury to a child counts.

Finally, it is not insignificant that the impropriety before us implicates the defendant's constitutional right to a fair trial. As we have noted, "[c]entral to a defendant's right to a fair trial is the right to have issues of fact and credibility decided by the jury." *State* v. *Vargas*, 80 Conn. App. 454, 462, 835 A.2d 503 (2003), cert. denied, 267 Conn. 913, 840 A.2d 1175 (2004); see also *Ardoline* v. *Keegan*, 140 Conn. 552, 555, 102 A.2d 352 (1954) ("[i]t must always be borne in mind that litigants have a constitutional right to have issues of fact decided by the jury"). Credibility determinations are the exclusive province of the fact finder, into which no expert may venture. *State* v. *Grenier*, supra, 257 Conn. 806; *State* v. *Iban C.*, supra, 275 Conn. 634.

Because we lack a fair assurance that the improperly admitted expert testimony did not substantially affect the verdict, we conclude that the defendant has satisfied his burden of demonstrating harm. Evaluating the victim's credibility was the task for the finder of fact, not Melillo as an expert witness. See *State* v. *Iban C.*, supra,

275 Conn. 636–37. Accordingly, the defendant is entitled to a new trial.

The judgment is reversed and the case is remanded to the trial court for a new trial.

In this opinion the other judges concurred.