******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

D'ANNA WELSH *v.* WILLIAM V. MARTINEZ, JR.
(AC 35335)

Gruendel, Prescott and Borden, Js.

*Argued February 17—officially released May 12, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Robaina, J.)

*James H. Lee*, for the appellant (defendant).

*Alinor C. Sterling*, for the appellee (plaintiff).

*Opinion*

GRUENDEL, J. The defendant, William V. Martinez, Jr., appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, D'Anna Welsh. He contends that the court improperly (1) permitted, during jury deliberations, the playback of a statement by the plaintiff's attorney, and (2) denied his motion for remittitur. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following relevant facts. The defendant at all relevant times was employed as a cardiovascular and thoracic surgeon at St. Francis Hospital (hospital). In January, 2001, the plaintiff was hired by the hospital as a physician's assistant in the cardiac surgery department. The defendant served as a supervisor to the plaintiff, who worked with several of his patients.

At that time, the defendant was married and living with his wife and nine children. The defendant nevertheless sought to become romantically involved with the plaintiff. The parties flirted with each other, but when the defendant expressed his interest in exploring a relationship with her, the plaintiff indicated that she would not consider dating a married man unless and until he moved out of his family's home. In April, 2001, the defendant moved out of that house and into an apartment. The parties then began a personal relationship that lasted for years. The plaintiff testified that she fell deeply in love with the defendant. The two talked about getting married and having children together, while shopping for engagement and wedding rings and selecting children's names. At the same time, the plaintiff "was very frustrated that [the defendant] was still married [because] that wasn't in accordance with the value system that [she] wanted to be living."

In 2002, the plaintiff and the defendant visited her father at a convalescent home in Texas, where he was suffering from lung cancer. The defendant shook her father's hand and told him not to worry about the plaintiff, as he would take care of her. That assurance "meant a lot" to the plaintiff. Her father passed away months later.

The plaintiff subsequently received an inheritance from her father. She testified that her "father was a very hard worker. I learned my work ethic from him and he had put money aside for his children, and I knew I needed to do something important with it, and I decided to purchase my first home." Once built, her new home was extremely special to her because she "felt accomplished [and] very grateful to [her] father because it would not have happened without him."

When the plaintiff moved into the house in November, 2004, she gave the defendant a set of keys, and he

began spending almost every night in her home. Soon thereafter, the defendant installed a wireless Internet network in the house against the plaintiff's wishes.[1] In December, 2004, the defendant gave the plaintiff a laptop computer as a Christmas gift. Unbeknownst to the plaintiff, the defendant had installed a spyware program on the computer that discreetly forwarded to him, via e-mail on a daily basis, a copy of everything composed thereon. A few months later, the defendant purchased an air purifier for the plaintiff. That would be the first of several gifts given to her by the defendant that secretly housed wireless spy cameras. After unsuccessfully attempting to install spy cameras in the ceiling above her bed, the defendant gave the plaintiff two clock radios and a television, which all contained spy cameras and were positioned in her bedroom in the direction of her bed. The air purifier likewise was positioned in the direction of her bathroom shower.

The defendant also installed a receiver antenna in a crawl space portion of the plaintiff's basement directly beneath her bedroom. That antenna received transmissions from each of the spy cameras. The transmissions then were recorded on a "multiplexer hard drive machine" connected to the antenna in the crawl space. The defendant testified that, when the plaintiff was not present, he routinely would enter the crawl space, attach a small television monitor to the hard drive machine and review captured footage. That behavior continued throughout 2005 and 2006. As a result, the defendant testified that he saw everything that transpired in the plaintiff's bedroom.

In addition, the defendant purchased a global positioning system (GPS) device in the summer of 2005. He installed that tracking device in the plaintiff's vehicle without her knowledge. The plaintiff also later learned that the defendant covertly accessed her cell phone records by impersonating her and adding his e-mail address to the account.

By February, 2007, the defendant had begun dating a nurse at the hospital without the plaintiff's knowledge. On February 12, 2007, the defendant returned his set of house keys to the plaintiff. At that time, he explained that he was preoccupied with starting his own medical practice and finalizing his divorce. The plaintiff was devastated. When he ended their relationship, the defendant never informed the plaintiff that he had installed surveillance equipment in her home, computer and vehicle, or that he was dating another woman. The defendant testified that, in the months that followed, he continued to receive daily e-mails documenting everything that the plaintiff wrote on her computer and that the surveillance equipment in the plaintiff's home continued to broadcast and record from therein.

On July 18, 2007, the plaintiff hired a plumber to repair a broken faucet on her property. In order to do

so, the plumber entered the crawl space in her basement and discovered the defendant's surveillance equipment. At the plumber's urging, the plaintiff contacted the police. Members of the Bloomfield Police Department responded to her residence and discovered both the recording equipment in the basement and the two clock radios in her bedroom containing spy cameras.[2] The plaintiff immediately realized that the defendant had been spying on her. As she testified, "I was devastated. I knew exactly how they had been—flashback in my head [to] him handing them to me." Realizing that the defendant had been spying on her for years, the plaintiff felt "betrayed, alarmed, betrayed, humiliated, controlled. I didn't feel like a person. I felt like I was just a—I don't even know, something that he—just like a toy of his, like I just didn't count." When she called the defendant and confronted him about the surveillance equipment, the defendant offered an "empty apology" and did not deny that he had spied on her over the course of their relationship. Notably, the defendant did not inform the plaintiff that he also had monitored her computer with a spyware program or that he had monitored her vehicle with a GPS device. At that time, the plaintiff declined to press charges against the defendant.

In the months that followed, the defendant, although uninvited, repeatedly appeared at the plaintiff's home. He sent her numerous e-mails and left items, such as books on marital infidelity, at her property. In response, the plaintiff told the defendant "to leave me alone." In September, 2007, the defendant informed her that "I can hear you from outside your house." The plaintiff found his words to be terrifying. As she recounted at trial:

"[The Plaintiff's Attorney]: Was it like a threat or how did that come up?

"[The Plaintiff]: It was like—it was like control. . . . Like scary, honestly scary.

"[The Plaintiff's Attorney]: Did you believe him?

"[The Plaintiff]: Yes.

"[The Plaintiff's Attorney]: Did you know at that point if you had gotten all of the spy equipment out of the house?

"[The Plaintiff]: Well, I didn't know how he was hearing me and I thought it was really weird that he always knew when I was home.

"[The Plaintiff's Attorney]: What do you mean by that?

"[The Plaintiff]: Well, like I would get home, and . . . five minutes later he would show up . . . unannounced and I didn't—I wasn't a creature of habit. It wasn't like I was always home at a particular time . . . . I didn't understand how he knew . . . who I was talking to. . . . I thought he was still [spying on] me

somehow."

The defendant continued to appear at the plaintiff's property unannounced, sometimes banging on her door. When she rebuffed his attempts to rekindle a relationship, the defendant left her a voice mail message stating that she was "fucking unbelievable." The defendant also left a handwritten note at her house that stated in relevant part: "I wanted to fix [our relationship] and start anew but you are your stubborn, nasty self." In another letter, dated November 14, 2007, the defendant complained of a lack of closure and accused the plaintiff of being "extremely unfair" and "evil." He stated that he had "tried and tried in every way imaginable to connect with you" and that "the way you have treated me recently is horrific."

On yet another occasion, the defendant drove by the plaintiff's house at night and spotted a vehicle in her driveway. The defendant then parked his vehicle, snuck into her backyard and approached a back window. From that vantage point, he watched the plaintiff and a male guest inside.[3] The defendant then returned to the front of the plaintiff's property and examined the license plate on the parked vehicle. The defendant testified that he used that license plate number to illegally identify the male guest inside the residence. The defendant then placed a phone call to the home of that male guest and left a message on an answering machine stating that "your husband is having an affair, and you should probably check his phone records."

The plaintiff testified that, as the defendant's behavior continued, she grew scared. As she put it: "I didn't want any contact with him. I didn't want to be confronted with him. I didn't want him to try to control another conversation with me. I didn't want him to touch me, try to hug me, try to make it better. I just want him to leave me alone. . . . I . . . was afraid he might set my house on fire." On cross-examination, the defendant's attorney inquired as to the basis of that concern. The plaintiff responded that the defendant was "[a]t times a very violent, angry-faced, frustrated, the handwriting in his letters, the voice in the voice mail, you are fucking unbelievable, I mean to say that to someone that you care about. I've heard a number of times of women getting killed because the man can't have them or won't comply. . . . [H]e's a man of control."

The unrelenting phone calls, letters and unannounced visits by the defendant to her house eventually overwhelmed the plaintiff in February, 2008. As she testified, "I got a text message from a friend of mine about a conversation I had . . . in my house that he would have no way of knowing and I just—I felt tortured in my own home, and it was at that point that I called the police to look into this further." The defendant thereafter was arrested and charged with voyeurism

and eavesdropping.

In response, the defendant filed an application for accelerated rehabilitation with the Superior Court. A hearing followed on July 15, 2008, at which the defendant provided sworn testimony in which he stated that the plaintiff "had nothing to worry about." The defendant further represented that no further surveillance equipment remained in the plaintiff's home.[4] On the basis of those representations, the court granted the defendant's application for accelerated rehabilitation.[5] The defendant did not apprise the court of the fact that additional surveillance equipment remained in the plaintiff's bedroom, her vehicle, and her computer.

In the year that followed, the plaintiff continued to feel unsafe in her house. The plaintiff ultimately retained a Boston company to inspect her home in January, 2010, in an effort to "know once and for all" that her home was safe and free of surveillance equipment. To the plaintiff's horror, that inspection proved fruitful, as images broadcasting from the plaintiff's bedroom appeared almost immediately on both a "professional looking" receiver as well as a handheld receiver that "anybody could get from Radio Shack." The plaintiff testified that her "worst fear" was realized when she learned that the television in her bedroom "didn't have to be turned on for [the spy camera] to be transmitting up to three football field lengths in distance from my house . . . it was still transmitting a view of whatever was happening in my bedroom."[6] As a result, the plaintiff testified that "I felt like I had been victimized. I felt betrayed, lied to, just dehumanized, taken advantage of, just very angry." The bedroom television was impounded at that time.

The plaintiff commenced this civil action against the defendant later that year. The operative complaint consisted of four counts alleging tortious invasion of privacy, negligence per se,[7] intentional infliction of emotional distress, and negligent misrepresentation. During a subsequent deposition of the defendant, the plaintiff first learned that the defendant also had installed the GPS device in her vehicle and the spyware program on her computer.

At trial, the plaintiff, as part of her case-in-chief, introduced into evidence, inter alia, the surveillance equipment found in her home, which had been impounded by the Bloomfield Police Department, and various correspondences from the defendant. Significantly, the defendant in his testimony admitted that he (1) had installed the surveillance equipment found in the plaintiff's home, (2) had reviewed captured transmissions therefrom, and (3) had surveyed her e-mail, her phone calls and her movements outside the home.

The jury also heard the testimony of Kevin Connelly, a licensed psychologist who specializes in treating post-

traumatic stress disorder. Connelly diagnosed the plaintiff as suffering from that affliction due to her symptoms, which included avoidance behavior, hypervigilance, persistent nightmares and flashbacks, difficulty concentrating and exaggerated startle response. He testified that "the variable that often has much more influence on a person's trauma . . . is the relationship variable. . . . [W]hen people are hurt intentionally by someone who is supposed to love them, who cares about them . . . can be tenfold more damaged because of that relationship. . . . [I]n [the plaintiff's] case because she never saw it coming, because she never expected it naturally you begin to doubt your own judgment, your own perceptions. You don't know who's safe, who's not safe. If people that love you are hurting you well what else could happen?" Connelly also explained that post-traumatic stress disorder "isn't something that goes away" and cannot be cured, only managed.

The plaintiff testified that, as a result of her experience with the defendant, she never feels safe and always feels as though someone is spying on her. She does not feel safe anywhere. The plaintiff suffers from the persistent grinding of teeth, an affliction known as bruxism, which necessitated the removal of a tooth. She also experiences frequent nightmares of "[b]eing covered in lava, suffocating, being beat up, being shot, full sweat in the middle of the night." Even when in the privacy of her own home, the plaintiff testified that "I never feel private . . . . I always . . . feel like there's no dignity, and I feel humiliated, and I feel I'm being laughed at . . . ." She testified that she remains ever fearful that someone is peering into her home.

At the conclusion of trial, the jury returned a verdict in favor of the plaintiff on all counts and awarded her $2 million in damages. The defendant thereafter filed a motion for remittitur, claiming that the jury's verdict was against the weight of the evidence and excessive as a matter of law. The court denied that motion, and this appeal followed.

I

The defendant first claims that the court improperly permitted the playback of a portion of testimony during the jury's deliberations. We disagree.

We review the trial court's decision to permit the playback of certain testimony for an abuse of discretion. See *State* v. *Rubaka*, 82 Conn. 59, 68, 72 A. 566 (1909) (jury review of trial testimony "must rest, to a great extent, in the discretion of the trial judge"); *State* v. *Fletcher*, 10 Conn. App. 697, 703, 525 A.2d 535 (1987) ("[a] determination of the reasonableness of the request for a review of testimony lies within the discretion of the trial court"), aff'd, 207 Conn. 191, 540 A.2d 370 (1988). Under that standard, "[w]e will make every rea-

sonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 276, 96 A.3d 1199 (2014).

The following additional facts are relevant to the defendant's claim. During its deliberations, the jury sent a note to the court, in which it inquired: "Can we have the plaintiff's testimony about police presence when James Atkinson was hired to check for more surveillance equipment?" The court reviewed that testimony with counsel outside the presence of the jury. The court then highlighted a portion of the plaintiff's June 21, 2012 testimony and then stated in relevant part: "All right. Well . . . the question that follows the [plaintiff's] statement where [her attorney] asked, 'Does anyone in your neighborhood' and so on . . . that should not come in. . . . [T]he question leading up to it, I think, can come because . . . it sets up the question and the answer that it appears that the jury is looking for, and I'll tell them if they want other things, they certainly are free to ask for other things . . . ." In response, the defendant's attorney replied, "Right." After both parties indicated that they were ready to proceed, the court called the jury into the courtroom and had the following portion of the audio recording played back:

"[The Plaintiff's Attorney]: There's been some testimony in the case about the transmission capabilities of these cameras and whether they can be seen out in your neighborhood or seen by other people with baby monitors and so. What's your fear about that?

"[The Plaintiff]: It's my worst fear. First off, that television didn't have to be turned on for it to be transmitting up to three football field lengths in distance from my house so while it was off it was still transmitting a view of whatever was happening in my bedroom. It was very simple. The monitor that Jim Atkinson had in his hand that I saw my bedroom on which someone else even outside my own neighborhood could have had and viewed, and I know they went down the street, Officer Ledger and Jim Atkinson to test this, and I—I fear that [the defendant] had one of those too. I still fear that [the defendant] had one of those, and I don't believe that he didn't."[8]

During playback of that testimony, the defendant's attorney objected to the inclusion of what he referred to as the "preamble" to the question posed by the plaintiff's attorney. After excusing the jury, the court engaged in the following colloquy with counsel:

"The Court: I understand your concern . . . but it's all part of the same answer. It's all one long answer

without questions in between so I think it was appropriate to start at the question and then play the answer back.

"[The Defendant's Attorney]: I understand, but Your Honor will note my objection to having that preamble read.

"The Court: Yes, sir."

The defendant plainly did not object to the playback of any of the plaintiff's testimony. Rather, his sole objection pertained to the playback of a prefatory remark to the question by her counsel, in which counsel stated: "There's been some testimony in the case about the transmission capabilities of these cameras and whether they can be seen out in your neighborhood or seen by other people with baby monitors and so." The defendant did not furnish any basis for his objection or request a curative instruction from the court.

On appeal, the defendant claims that the court improperly denied his objection to the playback of the prefatory remark of the plaintiff's attorney.[9] For multiple reasons, we do not agree.

First, we note that the defendant raised no objection to that statement when it was made at trial. This case thus is plainly distinguishable from *State* v. *Miguel C.*, 305 Conn. 562, 46 A.3d 126 (2012), the sole authority relied on by the defendant in support of his claim. Unlike the present case, the defendant in *Miguel C.* raised a distinct objection in the middle of the prosecutor's questioning at trial, which objection the trial court ultimately sustained. Id., 566–68. For that reason, our Supreme Court concluded that the playback of the stricken question during the jury's deliberations was improper. Id., 579–81. In particular, the court emphasized that "the contested testimony was not merely cumulative, but, rather, was the sole means by which the state was able to make [the contested statement] known to the jury." Id., 579.

By contrast, the substance of the contested statement in the present case was cumulative of other testimony. The prefatory remark of the plaintiff's counsel concerned the transmission capabilities of the spy cameras in the plaintiff's bedroom and whether they were capable of reception outside of her home. Following the plaintiff's testimony on direct examination that the spy camera in her bedroom television was capable of broadcasting "up to three football fields in distance" from her house—to which testimony the defendant did not object—the defendant elicited substantially similar testimony in his cross-examination of the plaintiff:

"[The Defendant's Attorney]: And this expert came in and swept [your home], found that the [television] was capable of sending a signal out although it could go to that equipment because that equipment which are all in evidence here was locked up. Correct?

"[The Plaintiff]: Correct.

"[The Defendant's Attorney]: So were you concerned that [the television] is broadcasting a signal of you or your family or loved ones to persons or persons unknown within the range that you talk about. Am I correct?

"[The Plaintiff]: Correct."

The defendant has provided this court with no authority to support his proposition that a trial court possesses the authority, in the midst of the jury's deliberations, to remove from the jury's consideration certain trial testimony that properly was elicited and to which no objection was raised. That novel assertion finds no support in Connecticut law. Because no objection was taken when the attorney made the prefatory remark at issue in the present case, and mindful of our obligation to indulge every reasonable presumption in favor of the trial court's ruling, we cannot say that the court abused its discretion in permitting the playback of the prefatory remark of the plaintiff's counsel.

Furthermore, any potential harm stemming from the playback of that prefatory remark was minimized by the court's limiting instructions. As this court repeatedly has observed, "a question from counsel is not evidence of anything." (Internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 317,      A.3d (2014), cert. denied, 315 Conn. 928, 109 A.3d 93 (2015). It is undisputed that the court, in its charge to the jury, specifically instructed that "[y]ou should determine the facts by careful consideration of all the evidence presented and based solely on the evidence . . . . [S]tatements made by lawyers . . . are not evidence. A question is not evidence. It is the answer [and] not the question or the assumption made in the question that is the evidence." "Our jurisprudence is clear . . . that unless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions." (Internal quotation marks omitted.) *State* v. *Boscarino*, 86 Conn. App. 447, 460, 861 A.2d 579 (2004). Nothing in the record before us suggests that the jury failed to heed those instructions.

## II

The defendant also claims that the court improperly denied his motion for remittitur. He maintains that the jury's monetary award is not supported by the evidence. He further alleges that the jury improperly predicated that award on a punitive, rather than compensatory, basis. We do not agree.

"In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict

is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . .

"[O]ur review of the trial court's decision requires careful balancing. . . . First, we must retrace the steps of the trial court. That is, we must begin by reviewing the evidence, construed in the light most favorable to sustaining the verdict, just as the trial court was required to do. We then must examine the trial court's decision in such a way that we employ every reasonable presumption in favor of its correctness. . . . Stated differently, we must examine the evidentiary basis for the jury verdict itself to determine whether the trial court reviewed the verdict in the light most favorable to its correctness. Where the evidence supports the jury's award of damages, a trial court abuses its discretion by ordering remittitur." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Tomick* v. *United Parcel Service, Inc.*, 135 Conn. App. 589, 614–15, 43 A.3d 722, cert. denied, 305 Conn. 920, 47 A.3d 389 (2012).

A

We first consider the defendant's claim that the jury's award of $2 million in damages is not supported by the evidence. The undisputed evidence before the jury revealed that the defendant conducted extensive covert surveillance of the plaintiff over the course of several years. That surveillance included intimate video transmissions from her bedroom and shower, daily reports as to every notation made on her computer, and GPS monitoring of her vehicle. The jury also had before it evidence that although the defendant swore under oath before the court at the accelerated rehabilitation hearing in July, 2008, that the plaintiff "had nothing to worry about" and that no further surveillance equipment remained in the plaintiff's home, the transmissions from her bedroom thereafter continued and the defendant continued to receive daily e-mail reports from the spyware on the plaintiff's computer. The jury also was presented with evidence that despite her request for the defendant to leave her alone, he continued to appear unannounced and uninvited at her home. His behavior terrified the plaintiff, particularly when he informed her that "I can hear you from outside your house." In addition, the defendant's angry and violent conduct left the plaintiff scared for her life.

In addition, the jury heard testimony from a licensed psychologist that, as a result of the defendant's actions, the plaintiff suffers from post-traumatic stress disorder, which cannot be cured. It also heard testimony that plaintiff was "tenfold more damaged" by the trauma intentionally inflicted by the defendant in light of her close personal relationship with him. There was evidence before the jury that, as a result of the defendant's conduct, the plaintiff exhibits avoidance behavior, hypervigilance, difficulty concentrating and an exaggerated startle response. She also suffers from bruxism and experiences persistent nightmares and flashbacks.

In her testimony, the plaintiff further detailed the pain and suffering she sustained as a result of the defendant's conduct. Apart from the humiliation, betrayal and devastation she experienced upon learning that the defendant had been spying on her for a number of years, the jury had before it evidence that the plaintiff suffered, and continues to suffer, pain and anguish stemming therefrom. She lives in a perpetual state of fear that someone is watching or spying on her and she does not feel safe anywhere. Even in her own home, she feels no sense of privacy. In short, her world view has been fundamentally altered as a result of the defendant's actions against her.

In his motion for remittitur, the defendant argued that the plaintiff "failed to claim any economic damages, and instead claimed pain and suffering caused by post-traumatic stress disorder for the balance of her life." The defendant renews that claim in this appeal, and appears to suggest that noneconomic damages alone cannot justify a sizeable award of damages. We disagree. As our Supreme Court has explained, "[c]omparison of verdicts is of little value. No one life is like any other, and the damages for the destruction of one furnish no fixed standard for others." (Internal quotation marks omitted.) *Katsetos* v. *Nolan*, 170 Conn. 637, 658, 368 A.2d 172 (1976). The destruction in the present case primarily is psychological, rather than physical, in nature. That does not diminish its degree, as evidenced by Connelly's testimony.

There exists no precise formula on which a court can instruct a jury as to the computation of compensation for pain and suffering. *Jerz* v. *Humphrey*, 160 Conn. 219, 221, 276 A.2d 884 (1971). A jury in such instances necessarily is tasked with quantifying something that is inherently difficult to quantify. In their closing arguments to the jury, the plaintiff requested an award of approximately $20 million in compensation in light of her thirty-seven and one-half year life expectancy; the defendant suggested that an award of $100,000 was more appropriate. The jury rejected both suggestions, and instead concluded that $2 million was proper compensation for the plaintiff's pain and suffering.[10]

"The award of damages for pain and suffering is peculiarly within the province of the trier, and will be sustained, even though generous, if it does not shock the sense of justice. . . . Proper compensation cannot be computed by a mathematical formula, and there is no iron-clad rule for the assessment of damages. . . . The test is whether the amount awarded . . . falls within the necessarily uncertain limits of just damages . . . ." (Citations omitted; internal quotation marks omitted.) *Manning* v. *Michael*, 188 Conn. 607, 616, 452 A.2d 1157 (1982). On the unique facts of this case, and construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury's monetary award does not shock the sense of justice or otherwise fall beyond the limits of just damages.

### B

The defendant also asserts that the jury improperly predicated its award of damages on a punitive, rather than compensatory, basis.[11] That assertion necessarily presumes that the jury disregarded the court's instructions.

In its charge, the court instructed that "it is up to you to decide what fair, just and reasonable compensation is . . . . The general rule of damages is this: Insofar as money can do it the plaintiff is to receive fair, just and reasonable compensation for all injuries and losses which are legally caused by the defendant's proven acts and or negligence. Under this rule *the purpose of an award of damages is not to punish or penalize the defendant but to compensate the plaintiff* for the resulting injuries and losses." (Emphasis added.) The court cautioned the jury that it "may not guess or speculate as to the nature or extent of the plaintiff's losses or injuries. The decision must be based on reasonable probabilities in light of the evidence presented during the trial."

The court then turned to the specifics of the case, noting that "the damages which are claimed are known as noneconomic damages. Noneconomic damages are monies awarded as compensation for nonmonetary losses and injuries which the plaintiff has suffered or is reasonably likely to suffer in the future as a result of the defendant's negligence and or [his] intentional acts. They're awarded for things such as physical pain and suffering, mental and emotional pain and suffering and loss of diminution, the ability to enjoy life's pleasures. In this case, the plaintiff seeks to recover noneconomic damages for each of the following types of nonmonetary loss or injury: her fear, extreme emotional distress, recurrent and intrusive thoughts of being exposed and violated, interference with her personal relationships, feelings of vulnerability and mistrust, sleep problems including damage to her teeth and difficulties concentrating as well as anxiety and anger." The

court then instructed that "[y]our award should be in accordance with the nature and extent of such physical impairment, loss of function or injury and the length of time that the plaintiff is reasonably expected to endure its negative consequences."[12] At the same time, the court admonished the jury that "[o]bviously your verdict cannot be reached on the basis of sympathy for any party or on the basis of prejudice in favor of or against any party."

Under Connecticut law, we presume "that the jury follows the instructions given by the court." *Gajewski* v. *Pavelo*, 229 Conn. 829, 837, 643 A.2d 1276 (1994); see also *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 403, 3 A.3d 892 (2010) ("[i]n accordance with our jurisprudence and the lack of evidence to the contrary, we presume that the jury followed the trial court's charging instructions"). On the record before us, we cannot say that the jury strayed from those instructions. Viewed in a light most favorable to sustaining the verdict, the present case involves a plaintiff irreparably damaged by the intentional acts of a loved one that destroyed any sense of privacy and security, even in her own home. The record does not indicate that the jury predicated its award on an improper basis, but rather that it sought to compensate the plaintiff for the injuries that resulted from the defendant's intentional conduct. We, therefore, conclude that the court did not abuse its discretion in denying the defendant's motion for remittitur.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff testified that she told the defendant that she did not want the wireless network installed in her home, stating that "[h]e . . . expressed his wanting wireless Internet in the house, and I adamantly did not want it in the house, because it felt creepy to me." The plaintiff testified that, despite her protests, he installed it anyway.

[2] The officers did not find the spy camera installed on the television in the plaintiff's bedroom.

[3] At trial, the defendant admitted that he had trespassed onto the plaintiff's property.

[4] At trial, the defendant testified as follows with respect to his representation at the July 15, 2008 hearing:

"[The Plaintiff's Attorney]: You were under oath at the [accelerated rehabilitation] hearing?

"[The Defendant]: Yes. . . .

"[The Plaintiff's Attorney]: You told the judge, you told [the plaintiff] there was no more spy equipment in her house?

"[The Defendant]: Correct.

* * *

"[The Plaintiff's Attorney]: [A]t that hearing—did you authorize [your attorney] to assure [the plaintiff] that there were no other surveillance [devices] except for the ones that the Bloomfield Police had already impounded?

"[The Defendant]: Yes.

"[The Plaintiff's Attorney]: So you made—you gave [your attorney] the authority to assure the court and to assure [the plaintiff] that there was no more surveillance left in her house.

"[The Defendant]: Yes."

[5] As conditions of his accelerated rehabilitation, the court also ordered the defendant to (1) be supervised for two years; (2) make a $500 donation to the court; (3) pay the defendant's counseling fees for one year; (4) have no contact with the defendant; (5) remain one hundred yards from her

property; and (6) see a psychologist.

[6] The surveillance inspector, James Atkinson, walked down the plaintiff's street and captured the transmissions from inside her bedroom with a handheld receiver.

[7] More specifically, the negligence per se count alleged that the defendant's conduct was unreasonable and violative of General Statutes §§ 53a-189, 53a-189a, and 53a-189b, which govern the offenses of eavesdropping, voyeurism, and dissemination of voyeuristic material, respectively.

[8] Prior to commencing this appeal, the defendant filed a motion for rectification with the trial court. The parties thereafter filed a stipulation with the court indicating precisely what was played for the jury during its deliberations on June 25, 2012. The court granted the motion for rectification and ordered the rectification of the June 25, 2012 transcript in accordance with the parties' stipulation.

[9] In his principal appellate brief, the defendant appears also to contest the propriety of the plaintiff's answer, arguing that "the plaintiff was able to insert, into her response to a question about what she feared, her opinion that images from the undiscovered camera could be seen from 300 yards away." We decline to review the merits of that assertion for two reasons. First, our rules of practice require a party, as a prerequisite to appellate review, to distinctly raise its claim before the trial court. See Practice Book § 5-2 ("[a]ny party intending to raise any question of law which may be the subject of an appeal must . . . state the question distinctly to the judicial authority"); Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at trial or arose subsequent to trial"). For that reason, we repeatedly have held that "we will not decide an issue that was not presented to the trial court. To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *State* v. *Martin*, 110 Conn. App. 171, 180, 954 A.2d 256 (2008), appeal dismissed, 295 Conn. 192, 989 A.2d 1072 (2010); see also *State* v. *Favoccia*, 119 Conn. App. 1, 14, 986 A.2d 1081 (2010) ("[i]t is axiomatic that issues not properly raised before the trial court ordinarily will not be considered on appeal"), aff'd, 306 Conn. 770, 51 A.3d 1002 (2012). The record reveals that the defendant did not voice any objection to the plaintiff's answer during either her trial testimony or the subsequent playback of that testimony to the jury as it deliberated.

Second, at oral argument before this court, the defendant's counsel conceded that he was challenging only the propriety of the prefatory remark of counsel, and not the subsequent answer provided by the plaintiff. We therefore confine our review to the sole objection raised by the defendant before the trial court.

[10] Calculated in light of her life expectancy, the plaintiff's request amounted to approximately $10,000 per week as compared to the defendant's suggestion of $50 per week. The jury's award of damages amounts to approximately $1000 per week.

[11] In his principal appellate brief, the defendant also complains that the jury's verdict was improperly predicated on certain testimony adduced at trial, such as a witness' statement that the defendant was "employed at a seven-figure salary." It nevertheless remains that the defendant did not object to such testimony at trial, nor has he claimed any evidentiary error with respect thereto in this appeal. The jury's consideration of that testimony, therefore, was not improper.

[12] The court also instructed the jury, consistent with the stipulation of the parties, that the plaintiff's life expectancy was thirty-seven and one-half years.